# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**LORI L. ANDERSON**
            **Plaintiff,**

            **v.**                                        **Case No. 13-C-0788**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
            **Defendant.**

## DECISION AND ORDER

Plaintiff Lori Anderson applied for social security disability benefits, claiming that she could not work due to low back pain, anxiety, and depression. The Social Security Administration ("SSA") denied her application initially and on reconsideration, as did an Administrative Law Judge ("ALJ") following a hearing. After the Appeals Council denied plaintiff's request for review, the ALJ's decision became the final word from the Commissioner of Social Security on the application. See Schomas v. Colvin, 732 F.3d 702, 707 (7th Cir. 2013). Plaintiff now seeks judicial review of the ALJ's decision.

The reviewing court will reverse an ALJ's determination only where it is not supported by "substantial evidence," meaning such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Murphy v. Colvin, 759 F.3d 811, 815 (7th Cir. 2014). In conducting substantial evidence review, the court must consider the entire administrative record, but it may not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute judgment for the ALJ's. Lopez ex rel. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003). If reasonable minds can differ over whether the claimant is disabled, the court must

uphold the decision under review. <u>Shideler v. Astrue</u>, 688 F.3d 306, 310 (7th Cir. 2012). Further, while the ALJ must build a logical bridge from the evidence to his conclusion, he need not provide a complete written evaluation of every piece of testimony and evidence. <u>Murphy</u>, 759 F.3d at 815. Rather, the ALJ need only minimally articulate his justification for rejecting or accepting specific evidence of disability. <u>Scheck v. Barnhart</u>, 357 F.3d 697, 700 (7th Cir. 2004). Where the claimant fails to present sufficient proof on a particular issue, the ALJ may satisfy his duty of articulation simply by noting the absence of evidence. <u>See</u> id. at 701 (citing <u>Steward v. Bowen</u>, 858 F.2d 1295, 1299 (7th Cir. 1988)). Finally, while the ALJ must comply with the Commissioner's regulations and Rulings for evaluating disability claims, not every technical violation warrants remand, as the doctrine of harmless error is fully applicable to judicial review of administrative decisions. <u>Keys v. Barnhart</u>, 347 F.3d 990, 994 (7th Cir. 2003).

## I.  FACTS AND BACKGROUND

Plaintiff filed the instant application in July of 2010, but she alleged a disability onset date of January 1, 2004, and the record contains medical evidence dating back ten years.[1] During this time, plaintiff received treatment for various impairments, including carpal tunnel syndrome, back pain, depression, and anxiety.[2]  I first review the voluminous medical evidence before turning to the procedural history of the case.

_____

[1]The record also references several previous applications for benefits, which were apparently denied (Tr. at 70 – referencing DIB denials 11/05, 11/07, and 8/09). However, the record contains little information on those claims, the ALJ did not apply res judicata regarding any of the previous determinations, <u>see</u> 20 C.F.R. § 404.957(c)(1), and the parties do not discuss the issue.

[2]She also received treatment for short-term illnesses and ailments and other preventive care.  I omit discussion of these records.

## A.    Medical Evidence

On January 5, 2004, plaintiff saw Dr. Dana Ilea complaining of bilateral wrist pain, intermittent since 1996, right more than left.  Plaintiff reported working in a department store, which did not require her to repetitively use her hands.  Dr. Ilea assessed possible carpal tunnel syndrome, recommending an EMG and starting her on Naproxen, an anti-inflammatory pain reliever.[3]  (Tr. at 508.)

On January 19, 2004, plaintiff saw Dr. Diana Verde, a psychiatrist with the Fond du Lac County Department of Community Programs, reporting continued mood swings and disturbed sleep on an increased dose of Sarafem (Fluoxetine), an anti-depressant.[4]  Her anxiety was improved on Buspar, an anti-anxiety medication.[5]  Dr. Verde assessed probable bipolar disorder, history of dysthymia, and generalized anxiety disorder.  Dr. Verde tapered off Fluoxetine secondary to ineffectiveness and continuation of mood swings, starting Lithobid (Lithium), which is used to treat manic depression.[6]  (Tr. at 545.)

Plaintiff returned to Dr. Ilea on January 27, 2004, complaining of dizziness, shortness of breath, palpitations, feeling like her heart was racing, and difficulty sleeping.  She noticed these symptoms since starting on Lithium on January 19.  Dr. Ilea ordered tests and started plaintiff on Toprol, a beta blocker used to treat angina and hypertension,[7] allowing plaintiff to

---

[3]http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html.

[4]http://www.drugs.com/cdi/sarafem.htm.

[5]http://www.drugs.com/buspar.html.

[6]http://www.drugs.com/mtm/lithobid.html.

[7]http://www.drugs.com/toprol.html.

return to work on January 29, 2004. (Tr. at 509.) On February 1, 2004, plaintiff underwent a stress test based on her report of palpitations. The test was negative, and she was advised to continue the beta blocker. (Tr. at 239.)

On February 5, 2004, plaintiff saw Dr. Elizabeth Bensen, on referral from Dr. Ilea, for evaluation of wrist pain. Exedrin helped her pain slightly. Examination was essentially normal. Dr. Bensen obtained an x-ray, sought insurance approval for an EMG, and switched plaintiff to generic Nabumetone, an anti-inflammatory.[5] (Tr. at 531.) The x-ray came back normal. (Tr. at 534.)

On February 23, 2004, plaintiff saw Dr. Brian Christenson at St. Agnes Hospital for a psychiatric evaluation. She reported that she had been receiving out-patient psychiatric treatment with Dr. Verde during the past year. Dr. Christenson noted that plaintiff had been hospitalized the previous February after an overdose of Tylenol following an argument with her boyfriend. She reported continued problems with depression, including low energy, low enthusiasm, and irritability. She had been on anti-depressants, namely Fluoxetine, since about 1997 after a postpartum depression. She complained that she could not maintain jobs due to boredom and trouble with motivation. She was at the time employed doing sales in a retail clothing store. She had recently started on Lithium due to mood swings and also took Buspar for anxiety. She reported some manic symptoms but denied psychotic symptoms or paranoia. She also denied suicidal tendencies. (Tr. at 439.) On mental status exam, she was alert and cooperative, with normal speech and motor activity. Her mood was neutral to sad, and her affect normal. Her thought content revealed no hallucinations, delusions, or suicidal thoughts.

---

[5]http://www.drugs.com/cdi/nabumetone.html.

She was oriented x3, fund of knowledge was normal, insight fair, and judgment adequate. Dr. Christenson diagnosed major depressive disorder and rule out bipolar affective disorder, with a GAF of 50.[6] He discontinued Fluoxetine and Lithium due to lack of benefits, and started Paroxetine, an anti-depressant.[7] (Tr. at 440.)

On August 26, 2004, plaintiff was discharged from outpatient services with Fond du lac County. The note indicated that plaintiff saw Dr. Verde on September 29, 2003, and January 19, 2004, and was to continue seeing Dr. Verde but left against staff advice. Her discharge diagnoses were dysthymic disorder and generalized anxiety disorder. (Tr. at 544.)

On October 1, 2004, plaintiff saw Dr. Ilea complaining of severe low back pain, not helped by Tylenol #3. Dr. Ilea replaced Tylenol with Vicodin. (Tr. at 512.) On June 24, 2005, plaintiff returned to Dr. (Dana Ilea) Vasquez seeking a Vicodin renewal, indicating that someone broke into her apartment and stole her money and medications. Dr. Vasquez noted that an MRI from August 2002 showed mild degenerative L5-S1 dessication. Dr. Vasquez further noted plaintiff's history of overdose/ suicide attempt, but that she was stable on the anti-

---

[6]GAF ("Global Assessment of Functioning") rates the severity of a person's symptoms and her overall level of functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting herself or others. Scores of 81-90 reflect "minimal" symptoms, 71-80 "transient" symptoms, 61-70 "mild" symptoms, 51-60 "moderate" symptoms, 41-50 "severe" symptoms, 31-40 some impairment in reality testing, 21-30 behavior considerably influenced by delusions or hallucinations, and 11-20 some danger of hurting self or others. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000). The fifth edition of the DSM, published in 2013, abandoned the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." Williams v. Colvin, 757 F.3d 610, 613 (7th 2014).

[7]http://www.drugs.com/paroxetine.html.

5

depressant Citalopram[8] and followed by Dr. Christenson. Dr. Vasquez assessed degenerative disc disease with low back pain and sciatica, renewing Vicodin and requiring plaintiff to sign a controlled substance agreement. (Tr. at 514.)

On August 3, 2005, plaintiff saw Dr. Thomas Carlson for a hand injury following a fall. X-rays revealed no fracture, and Dr. Carlson assured her it would resolve on its own. (Tr. at 518, 535.)

On January 17, 2006, plaintiff returned to Dr. Vasquez, complaining of left leg pain and low back pain, intensity 9/10 without medication, 2/10 with medication. She also complained of cervical pain radiating to the right arm since a motor vehicle accident on December 20, 2005. Dr. Vasquez assessed cervical neuralgia since the accident, providing a trial of Medrol Dosepak,[9] Soma,[10] and Vicodin. Dr. Vazquez also indicated that physical therapy would be beneficial, and that plaintiff's low back pain would also respond to the medications. (Tr. at 460.)

On October 25 and November 8, 2006, plaintiff underwent a neuro-psychology consult with Linda Bernardin, Ph.D, on referral from one of her instructors at Moraine Park Technical College, where she took classes, to determine whether she had a learning disability.[11] Dr.

---

[8]http://www.drugs.com/citalopram.html.

[9]Methylprednisolone (Medrol Dosepak) is a steroid used to treat many different inflammatory conditions. http://www.drugs.com/mtm/medrol-dosepak.html.

[10]Soma is a muscle relaxer used together with rest and physical therapy to treat injuries and other painful musculoskeletal conditions. http://www.drugs.com/soma.html.

[11]Dr. Bernardin's report indicated that plaintiff "receives SSDI due to severe anxiety and depression." (Tr. at 437.) As indicated in n.1, supra, however, the record reflects prior disability denials in November 2005, November 2007, and August 2009. (Tr. at 70; see also Tr. at 288.)

Bernardin conducted an interview, reviewed select academic records, and administered the Wechsler Adult Intelligence Scale (WAIS-III) and Wide Range Achievement (WRAT-3) tests. (Tr. at 436.)  At that point, plaintiff was attending school part-time and working part-time in a school daycare and in the school kitchen.  On exam, she was fully oriented and alert, appearing mildly anxious but not depressed.  She had mild difficulties with verbal expression and comprehension, and her answers to questions were sometimes inappropriate and suggestive of a tendency to interpret questions in an overly concrete manner.  Memory appeared grossly intact.  There were no signs of thought disorder, delusions, or hallucinations. Insight and judgment appeared fair.  Her effort on testing appeared excellent, and the results were felt to be reliable.  On tests of intelligence and reason, her scores ranged from mildly defective to average.  Her full scale IQ was 70, falling at the lower end of the borderline range. On tests of academic achievement, her scores were slightly higher than her IQ scores, but still in the borderline range.  Dr. Bernardin concluded that plaintiff's academic struggles related to a generalized low-level functioning in many cognitive areas and did not reflect a specific learning disability.  (Tr. at 437.)

On November 28, 2006, plaintiff returned to Dr. Vasquez to renew her medications, complaining of anxiety and low back pain radiating down the left thigh.  Dr. Vasquez ordered a lumbar MRI, provided a referral to the pain clinic for a possible epidural, and prescribed Naproxen, a nonsteroidal anti-inflammatory drug,[12] and Vicodin.  (Tr. at 462.)  For anxiety, she suggested follow-up with Dr. Christenson and continued use of Citalopram and Buspar.  (Tr. at 463.)  On December 1, plaintiff underwent a lumbar MRI, which was negative.  (Tr. at 369.)

---

[12]http://www.drugs.com/naproxen.html.

Plaintiff next saw Dr. Vasquez on February 7, 2007, complaining of a sore tongue. She was at the time working at a school helping serve breakfast. Dr. Vasquez assessed glossitis and provided medications for possible acute bronchitis. (Tr. at 464.)

On June 13, 2007, plaintiff was brought to the emergency room ("ER") with an ingestion overdose, taking Valium, Vicodin, and alcohol. (Tr. at 284, 430-31.) The ER doctor obtained a psychiatric consult, and plaintiff advised Dr. Elliot Phillips that she was not trying to kill herself. Dr. Phillips found her hard to interview, as she seemed dazed and confused. She indicated that after an argument with a neighbor she returned to her apartment and started drinking. She began to hear voices of unclear content, then overdosed on medication, although her intent was unknown. She had been seen by Dr. Christenson since 2004, with a diagnosis of major depressive disorder, as well as Dr. Cheryl Huff, a clinical psychologist, for psychotherapy. (Tr. at 419.) She had a previous hospitalization related to an overdose in 2003. On mental status exam, she was oriented x2, social and eye contact were poor, with questionable suicidal ideation. Dr. Phillips noted probable auditory and visual hallucinations. Her fund of knowledge was fair, insight and judgment impaired. Dr. Phillips assessed possible paranoid schizophrenia, possible alcoholism, status post suicide attempt, and rule out chronic depression, with a GAF of 40. She was admitted to the inpatient behavioral health unit to be seen by Dr. Christenson, with a guarded prognosis. (Tr. at 420, 432-33.)

Plaintiff discharged from the unit on June 18, 2007, with a final diagnosis of major depressive disorder and alcohol abuse and a GAF of 55. While in the unit, she received therapy and her mood improved. She denied any further suicidal thoughts. She had initially reported hallucinations but later said she believed they were her only own thoughts. Her emergency detention was canceled. (Tr. at 422.) She was discharged with medications

including Buspar and Citalopram and followup with Dr. Christenson and Dr. Huff. (Tr. at 423.)

In August and September 2007, plaintiff canceled or failed to appear for her appointments with Dr. Huff.[13] (Tr. at 457.) On October 10, 2007, she saw Dr. Christenson, feeling overwhelmed with work and school. He assessed major depressive disorder and continued her medications. (Tr. at 457.) Plaintiff was a no call/no show with Dr. Huff on October 26, and Dr. Huff send a letter discharging her. (Tr. at 457.) She did see Dr. Christenson on November 20, indicating that she was forgetful, missing appointments and mixing up words when writing. She reported being socially withdrawn and taking on-line classes in childcare. She was depressed mildly at times, sleep was fair, and she had no suicidal ideation. Dr. Christenson continued her medications. (Tr. at 458.)

On October 18, 2007, plaintiff returned to Dr. Vasquez for renewal of Naproxen, Flexeril, and Vicodin for her low back pain. She rated her pain 7/10, increased by prolonged sitting or standing. Her last MRI from December 2006 was normal. She complained of left leg twitching and giving out the previous week. She had been off Vicodin since her June overdose. (Tr. at 468.) Dr. Vasquez declined to provide narcotics but renewed Naproxen and Flexeril. She further advised plaintiff get an appointment in the pain clinic if her low back pain was indeed so severe, but plaintiff declined. (Tr. at 469.)

On December 14, 2007, plaintiff returned to Dr. Huff for psychotherapy, reporting that her grandfather's health was failing. She indicated that she was not taking classes next term so she could help her grandparents. She reported being extremely stressed and having severe issues with her memory. She was working part-time. She had applied for disability but was

---

[13]On August 31, 2007, plaintiff went to the ER after she cut her thumb on a broken wine glass, apparently an accident, not an attempt at self-harm. (Tr. at 281-82.)

turned down.  (Tr. at 456.)  On December 26, plaintiff saw Dr. Christenson, reporting feeling anxious and depressed.  She indicated she would appeal the denial of social security.  Dr. Christenson diagnosed major depressive disorder and continued medications.  (Tr. at 456.)

On January 4, 2008, plaintiff returned to Dr. Huff, indicating she had a week off for the holidays, which was nice.  She was procrastinating about cleaning and laundry.  She reported trouble sleeping due to racing thoughts, and that her knee and hip were still bothering her.  She denied hearing any voices.  She was to contact Dr. Christenson if not sleeping better.  (Tr. at 455.)  Plaintiff was a no show for her appointment with Dr. Huff on February 8.  (Tr. at 455.)

On February 21, 2008, plaintiff saw Dr. Karl Pennau, an orthopedist, regarding her left leg.  She reported left leg pain since a fall while roller skating many years earlier in which she broke her coccyx.  She complained of general leg pain, weakness, instability, and decreased sensation.  On exam, she had tenderness over the left greater trochanter, as well as the coccyx.  She seemingly had decreased sensation along the lateral calf and the plantar surface of the left foot.  Straight leg raising was unremarkable.  (Tr. at 243.)  Dr. Pennau assessed left trochanteric bursitis and suggested she consult with Dr. Pontus Ostman, a pain management specialist, for evaluation of possible neurologic pressure.  (Tr. at 244.)

Plaintiff returned to Dr. Huff on February 25, 2008, reporting significant pain in her leg and back, for which she had been referred to a pain clinic.  She also reported daily headaches, issues with her daughter, and problems with her boyfriend's temper and drinking.  She reported no voices or suicidal ideation.  (Tr. at 455.)

On March 11, 2008, plaintiff saw Dr. Ostman at the pain clinic regarding her left gluteal pain.  Plaintiff reported increased pain with activity and sitting, decreased with rest and medication.  She also reported associated symptoms of occasional left lower extremity

10

weakness and paresthesias. (Tr. at 415, 631.) She was at the time taking Cyclobenzaprine (Flexeril), Tylenol, and Naprosyn (Naproxen) for pain. She was working 10-12 hours per week in childcare. (Tr. at 416.) On exam, she was in no acute distress, and pain behavior was absent. Her posture and gait were normal, transfers quick, and general muscular tone and strength normal. Squatting was normal, except she favored the right. Range of lumbar motion was full in all directions. Standing on tiptoes and heels was normal, and lower extremity strength symmetrical. Muscular examination of the low back and gluteal area showed concordant pain in the left gluteus minimus muscle. Otherwise, the exam was normal. (Tr. at 417, 633.) Dr. Ostman found the exam and history consistent with connective tissue type pain in the left gluteal area, recommending physical therapy. (Tr. at 418, 634.)

On March 17, 2008, plaintiff saw Dr. Huff, discussing issues with her boyfriend's temper and counseling for her daughter. She also reported trouble sleeping, although she had not been taking the Ambien prescribed by Dr. Christenson; she agreed to resume. Plaintiff also recognized manic symptoms (e.g., extremely talkative, not sleeping much), and they focused on ways to manage those symptoms. Dr. Huff recommended that she contact Dr. Christenson. (Tr. at 454.) Plaintiff saw Dr. Christenson March 26, reporting low motivation; she had stopped attending classes. Dr. Christenson continued her medications and advised her to limit alcohol consumption. (Tr. at 453.)

On March 28, 2008, plaintiff returned to Dr. Vasquez for evaluation of a possible broken nose after a fall. (Tr. at 473.) Dr. Vasquez ordered an x-ray (Tr. at 473), which revealed a non-displaced nasal bone fracture (Tr. at 300).

On April 7, 2008, plaintiff canceled her appointment with Dr. Huff. (Tr. at 453.) Three days later, paramedics took plaintiff to the ER after her boyfriend found her disoriented and

11

became concerned that she had taken too much medication. (Tr. at 271.) She admitted drinking and then taking extra doses of Tylenol #3 after an argument with her boyfriend. She also did some cutting on her wrists to punish herself. ER doctors admitted her to the in-patient behavioral health unit, where she was seen by Dr. Christenson. Plaintiff noted problems with depressed mood, low energy, low enthusiasm, and trouble concentrating, as well as periods of being extremely talkative and having decreased need for sleep. (Tr. at 404.) On mental status exam, her speech and motor activity were normal, her mood anxious and sad, speech and affect normal. Thought content included no delusions. She admitted seeing some shadows recently but denied recent auditory hallucinations. She described occasional racing thoughts and rapid speech. She denied suicidal thoughts and said she took the extra pills to try to punish herself, and that she cut herself because she was angry rather than wanting to end her life. Her cognitive functioning included orientation x3. She had difficulty recalling events leading up to the hospitalization. Her fund of knowledge was in the dull-normal range, her insight marginal, and her judgment rather poor. Dr. Christenson diagnosed major depressive disorder, single episode, chronic; rule out bipolar disorder, alcohol abuse, marijuana abuse; with a GAF of 30. (Tr. at 405.) His treatment plan included close observation, individual and group psychotherapy, continuance of current medications, and consideration of a mood stabilizer. He also obtained an AODA assessment. (Tr. at 406.)

Plaintiff completed the AODA assessment on April 11, 2008, reporting that she had a few drinks, took her medication, and then took it again because she could not remember taking it. She indicated that due to feelings of depression and worthlessness she became destructive and drank. (Tr. at 407.) She was assessed with alcohol dependence and cannabis abuse (Tr. at 410) and found to be an appropriate candidate for out-patient treatment (Tr. at 411). She

12

denied current suicidal ideation. (Tr. at 411.)

At the time of plaintiff's April 15, 2008, discharge, Dr. Christenson diagnosed major depressive disorder and alcohol abuse, with a GAF of 60. He indicated that over the course of her admission her mood gradually improved. (Tr. at 413.) She denied suicidal thoughts once she sobered up. (Tr. at 413-14.) She was to complete intensive out-patient AODA group therapy, be seen in followup by Dr. Christenson, and to resume out-patient psychotherapy with Dr. Huff. (Tr at 414.) Plaintiff attended AODA sessions on April 16 and 18, 2008, reporting abstinence, but was a no call no/show on April 23, 2008 (Tr. at 452), and missed her other sessions in April and May 2008 (Tr at 451).

On May 8, 2008, plaintiff went to the ER complaining of neck pain following a car accident. (Tr. at 257.) Doctors diagnosed neck strain and post-contusion headache, prescribing Tramadol, a narcotic-like pain reliever,[14] and Skelaxin, a muscle relaxer.[16] (Tr. at 259.) A head CT showed no evidence of acute hemorrhage or fracture, and a cervical spine CT showed an intact cervical spine with mid-cervical degenerative change. (Tr. at 260.)

On May 20, 2008, plaintiff saw Dr. Huff, tearful because her grandfather was in the hospital. She acknowledged that she had not followed through with AODA appointments. Plaintiff agreed to no alcohol or drugs and made a list of ways to cope without them. (Tr. at 450.) Plaintiff called on May 22 to report that her grandfather died. Dr. Huff called to offer condolences and to offer an appointment today or tomorrow. (Tr. at 450.) Plaintiff did not appear for her group session on May 23. (Tr. at 450.)

---

[14]http://www.drugs.com/tramadol.html.

[16]http://www.drugs.com/skelaxin.html.

On June 10, 2008, plaintiff saw Patricia Michels, APNP, for evaluation of bilateral carpal tunnel syndrome. She had previously been seen for this condition in 2004 by Dr. Benson, who recommended electromyogram studies, but plaintiff could not get insurance approval. Plaintiff reported symptoms since 1996, with recently increased pain in both wrists. (Tr. at 477.) She was off work for the summer; during the school year she worked at an elementary school in the lunch program and in the daycare; she planned to return in the fall. On exam, her grip strength was strong and equal bilaterally. Cervical range of motion was full in all planes. Tinel sign was positive bilaterally, and Phalen sign mildly positive. She had full range of wrist motion. NP Michels assessed bilateral carpal tunnel syndrome, referring her for EMG studies with Dr. Benson, and providing wrist splints. (Tr. at 478.)

Plaintiff was a no call/no show for her appointment with Dr. Huff on June 24, 2008. (Tr. at 450.) She returned on June 30, and they discussed grief issues over the death of her grandfather, as well as plaintiff's recent assault by her boyfriend. She filed a police report and applied for a restraining order. (Tr. at 450.) Dr. Huff also encouraged her to follow through with AODA treatment and discouraged her from drinking. Dr. Huff noted no suicidal ideation. (Tr. at 449.) Plaintiff canceled her appointment with Dr. Huff on August 4. (Tr. at 449.) On August 18, the AODA counselor closed plaintiff's case due to her non-attendance. (Tr. at 451.)

On August 20, 2008, plaintiff saw Dr. Benson, complaining of chronic bilateral wrist and hand pain of equal severity. Tinel sign and Phalen maneuver were positive, but she had full wrist range of motion and normal strength in the hand and forearm muscles. (Tr. at 481.) The EMG study showed evidence of bilateral carpal tunnel syndrome, fairly mild in severity. (Tr. at 250-51, 481.) Dr. Benson suggested surgical release, forwarding the report to NP Michels to determine further care. (Tr. at 481.)

On August 28, 2008, plaintiff saw Dr. Huff, indicating that she had returned to school, taking one class in the classroom and another on-line. She indicated that school had significantly increased her anxiety. She further indicated that she did not work that summer, was behind on her bills, and was worried about her grandmother. She was not sleeping well. Dr. Huff encouraged plaintiff to contact Dr. Christenson and refrain from drinking alcohol. Dr. Huff noted no suicidal ideation. (Tr. at 449.) Plaintiff was a no show for her September 9 appointment with Dr. Christenson. (Tr. at 453.)

On October 31, 2008, Dr. Huff discharged plaintiff from therapy. Over the course of treatment, 23 sessions were held with inconsistent attendance – nine missed and seven canceled appointments. Dr. Huff listed a fair prognosis due to moderate level of involvement and fair follow-through on treatment recommendations. (Tr. at 448.)

On November 8, 2008, plaintiff went to the emergency room complaining of low back pain of abrupt onset. (Tr. at 268.) Doctors provided Vicodin and Cyclobenzaprine, discharging her home in stable condition. (Tr. at 270.)

On November 20, 2008, plaintiff underwent an MRI of the lumbar spine, which showed a somewhat diffuse but predominantly central disc herniation at L5-S1, slightly larger than an old study of December 1, 2006, but with no significant compression of the thecal sac or nerve roots. The remaining levels showed normal disc morphology. There was mild facet degeneration at L-4-L5 and L5-S1 without spinal stenosis or foraminal narrowing. (Tr. at 298-99, 371-72.)

On December 12, 2008, plaintiff returned to Dr. Ostman regarding her left gluteal pain. Plaintiff reported that since last seen, she had attended physical therapy and got relief for her pain. She failed to show up for a followup. The pain had now gradually returned, and plaintiff

15

was unable to do her home exercise program. She complained of constant, nagging pain in the left gluteal area. (Tr. at 401, 628.) On exam, her posture and gait were normal, but her transfers slow. Her balance was good, but squatting difficult. Range of motion of the lumbar spine was normal in all directions, as was hip range of motion. Her major pain was in the left gluteal area. Dr. Ostman suggested another round of physical therapy. (Tr. at 402, 629.)

Plaintiff was seen for a physical therapy evaluation on December 22, 2008. She was at the time working 11 hours per week as a child care specialist. She related her pain to the roller skating accident many years earlier, in which she fell and broke her tailbone, with pain off and on since then, flaring up one month ago. (Tr. at 560.) She complained of sharp pain and her leg giving out. (Tr. at 561.) Plaintiff self-discharged from therapy on January 5, 2009, after two sessions. She rated her pain 4-5/10 and indicated she was able to stand and sit at work, working 4-½ hours per day. She was given a home exercise program. (Tr. at 563.)

On January 27, 2009, plaintiff saw Dr. Ostman for follow up of her left gluteal pain. Since her last visit, she had completed a few physical therapy visits and started her own stretching program. (Tr. at 397, 399-400, 626.) Overall, the pain was fairly minor. (Tr. at 397, 626.) On exam, posture was normal and transfers quick. Dr. Ostman found that she was improving. He showed her additional stretches. (Tr. at 398, 627.)

On March 26, 2009, plaintiff was taken to the ER by ambulance after taking 10 Naproxen along with five drinks. (Tr. at 262.) She stated that she took the pills because she was depressed but did not want to kill herself. She also admitted smoking marijuana two days earlier. She reported vomiting several times since the ingestion. (Tr. at 263.) Doctors diagnosed depression, medication overdose, and alcohol intoxication, and transferred her to the Fond du Lac County Acute Unit. (Tr. at 265, 547.) There, plaintiff again denied suicidal

thoughts or plans, providing no specific answer why she took the excessive Naproxen pills. She had been working as an assistant teacher. (Tr. at 549.) On mental status exam, she was slightly cooperative and courteous, slow to respond to questions. She was coherent and relevant in her stream of mental activity. Her affect was labile and her mood irritable. She denied any thoughts or plans of doing harm to herself or others, and denied auditory or visual hallucinations. She was oriented x3, and her memory showed no gross abnormality. She lacked insight and her judgment was impaired. (Tr. at 550) Dr. J.R. Musunuru diagnosed alcohol dependency, dysthymia, and mixed character disorder, with a GAF of 50 to 60. (Tr. at 551-52.)

Plaintiff remained in the Fond du Lac County unit from March 26 to March 30, 2009, when she was discharged doing quite well with no withdrawal symptoms, suicidal ideation, or psychotic symptoms. (Tr. at 547.) Dr. Yogesh Pareek diagnosed alcohol dependency, dysthymia, and mixed personality disorder, with a GAF of 60. Her discharge medications included Metoprolol (a beta blocker),[17] Celexa (Citalopram), Buspar, and Lamictal (an anti-epileptic medication also used to treat manic depression).[18] (Tr. at 548.)

On April 26, 2009, plaintiff underwent a consultative exam set up by the state Disability Determination Service ("DDS") with Dr. A. Neil Johnson,[19] complaining of back, left hip and leg pain, which she related to the fall roller skating in which she fractured her tailbone. She indicated that an MRI taken a few years ago showed a herniated disc. She complained of

---

[17]http://www.drugs.com/metoprolol.html.

[18]http://www.drugs.com/lamictal.html.

[19]This exam ostensibly pertained to one of plaintiff's previous applications for benefits.

trouble sleeping and of incontinence. She worked part-time at a daycare center. She reported being able to lift 20 pounds, walk 15 yards, stand five minutes, and sit five minutes. She also reported that her left leg had given out, causing her to fall. She further reported a thirteen year history of manic depressive illness, for which she saw a psychiatrist. On exam, Dr. Johnson noted that she had full use of the hands. She displayed tenderness to palpation of the back and straight leg raising was positive. She had mild difficulty getting on and off the exam table, mild difficulty heel and toe walking, moderate difficulty squatting, and was unable to hop. Range of motion appeared normal. (Tr. at 253.) Dr. Johnson diagnosed possible L5 radiculopathy and manic depressive illness. (Tr. at 254.)

On May 19, 2009, plaintiff returned to Dr. Vasquez, complaining of headache and cervical spine pain, which she related to a May 8, 2009 car accident for which she was seen in the ER. She indicated a CT scan was normal, but Dr. Vasquez could find no record of the scan or of an ER visit. The last ER note was from March 26, 2009, when she was seen for an overdose of medication. Plaintiff stated that the ER doctor gave her two prescriptions that she could not tolerate, but none could be found. (Tr. at 489.) Dr. Vasquez would not prescribe controlled substances due to the overdose risk, instead referring her to the neurology department and encouraging her to follow-up with psychiatry. (Tr. at 490.)

On June 9, 2009, plaintiff saw Lori Pierquet, Psy.D., for a psychological evaluation set up by the DDS. Plaintiff reported that this was her third or fourth application for benefits. Her chief complaint was that she was on so many medications she felt like a zombie. She stated that she did not feel like getting out of bed or leaving her house. She stated that she was forgetful and was not sure her employer would take her back because she had been in the hospital. Plaintiff reported that her anxiety started at age 27 after the birth of her daughter.

18

She reported being in the hospital one or two times per year for the past few years.  She stated

that she did not want to feel pain so took too many medications.  (Tr. at 288.)  She reported

taking various medications for pain, high blood pressure, anxiety, acid reflux, bipolar disorder,

and muscle spasms.  She indicated that her doctor would no longer provide Vicodin because

she had taken too much too many times.  She stated that the pain in her low back, as well as

depression and left-side pain, was too much to cope with; her health left her helpless.  She

reported issues with drinking too much in the past but had cut back.  She further reported that,

with all the medications she was on, when she drank she felt "spacey" and didn't care about

things.  She reported occasional marijuana use. (Tr. at 289.)  She further reported a sense of

worthlessness and guilt, with twice weekly crying spells.  She denied suicidal ideation and

indicated that she had not really tried to kill herself in the past, stating that when she was really

depressed she did not want to feel anything.  (Tr. at 290.)  She reported past hallucinations,

but they stopped after she started on Lamictal in 2007 or 2008.  She was oriented to person

and place but was off on the date by one day.  She could recall recent and remote personal

history with no apparent difficulty.  She could recall three of three words immediately after

hearing them, and two of three after five minutes.  She had no trouble concentrating and

staying focused for a one hour interview.  Her judgment and insight were adequate in many

spheres but more questionable in terms of substance use and management of chronic health

problems.  On a typical day, she got up, got ready for work, and worked until 9:00 a.m.  She

then went to the store or her grandmother's, and then home.  At home, she watched TV then

picked up her daughter at 2:50 p.m.  She would then make supper, watch TV, and go to bed.

She sometimes did her own cooking, and she did dust and clean the toilet and sinks.  Her

friend Danny or her daughter vacuumed.  She did drive, but only in Fond du Lac.  She owned

19

three cats and handled her own money. (Tr. at 291.) She was uncomfortable with unfamiliar people but socialized with people she knew; she reported daily contact with her boyfriend, daughter, mother, and grandmother. Her concentration was intact, she was a persistent worker, and she showed adequate pace for cognitive tasks but reported slowed pace for physical tasks due to back pain. (Tr. at 292.) Dr. Pierquet diagnosed polysubstance dependance and bipolar disorder, with a GAF of 50 and a guarded prognosis contingent on her ability to become abstinent and manage her chronic health problems. Regarding her work capacity, Dr. Pierquet concluded:

> Claimant can understand, remember, and carry out simple instructions. Claimant was able to concentrate. Claimant has no difficulty taking directions from supervisors. Claimant can get along with co-workers. Claimant was able to maintain a part-time work schedule with regular attendance and punctuality (although reports missing work because of depression and substance use, resulting in hospitalizations). Good work pace for cognitive but slowed for physical tasks due to back/leg pain. Claimant can tolerate stressful times at work. Claimant showed good hygiene. Claimant seemed quite aware of normal hazards. Claimant does drive.

(Tr. at 293.)

On June 15, 2009, plaintiff returned to NP Michels to discuss management of her carpal tunnel syndrome. Michels noted that she sent plaintiff for EMG studies nearly a year ago, but plaintiff did not return for follow up. Plaintiff complained of bilateral wrist pain, left greater than right, worse with activities, wondering if she needed surgery. On exam, her grip strength was strong and equal, and range of motion full. Michels assessed bilateral carpal tunnel syndrome and chronic bilateral wrist pain. Although the EMG studies indicated a fairly mild problem, given the duration of her symptoms and the lack of improvement with conservative therapy, Michels referred plaintiff for a surgical opinion. (Tr. at 491.)

On July 28, 2009, plaintiff underwent an x-ray of the left hip, which was essentially

normal.  (Tr. at 297.)  On August 3, plaintiff underwent a lumbar MRI, which showed a disc herniation at L5-S1, increased since the previous study from November 2008, causing significant compression on the thecal sac and S1 nerve root on the left.  (Tr. at 295-96, 302-03, 373-74.)

On October 1, 2009, plaintiff failed to appear for her appointment with Dr. Christenson. (Tr. at 394.)  She received no further psychiatric treatment until March 2, 2010, when she saw Dr. John Whelan, a psychiatrist with the Fond du Lac County Department of Community programs, for an initial psychiatric evaluation.  Dr. Whelan noted that she had missed two appointments with Dr. Christenson, and he fired her from his practice.  She reported that she did not feel like leaving the house.  She also reported hearing voices telling her to cut herself, although not lately.  She felt that her medications had been helpful.  She had some OCD traits, tending to wash her hands and fearing public doorknobs.  She took classes on-line to become an assistant teacher because she did not like being in groups of people she did not know.  She was laid off from her last job doing childcare because she missed work due to anxiety.  Her unemployment was initially denied but then granted.  Her current medications included Buspar, Citalopram, and Lamictal.  (Tr. at 541.)  Dr. Whelan diagnosed obsessive-compulsive disorder ("OCD"), recurrent depressive disorder versus bipolar disorder, and PTSD traits from her father leaving the family when she was 3-½ (Tr. at 542), with a GAF of 65 (Tr. at 543).  Dr. Whelan renewed Lamictal and Buspar, adding Trazodone (an anti-depressant),[20] and tapering off Citalopram as her symptoms of anxiety seemed to be getting out of hand.  (Tr. at 534.)

On March 11, 2010, plaintiff returned to Dr. Vasquez, with complaints of severe low back

---

[20]http://www.drugs.com/trazodone.html.

pain radiating to the left leg.  The MRI from August 2009 indicated L5-S1 disc herniation.

Plaintiff stated that her depression had improved.  She was laid off from work but attending

school at Moraine Park Technical College.  (Tr. at 501.)  On exam, she walked with a limp and

was unable to get on the exam table.  She appeared to be in significant discomfort when trying

to walk or stand.  Dr. Vasquez recommended follow up with the neurosurgical department and

the pain clinic.  In the meantime, Dr. Vasquez started her on Prednisone and Soma, declining

to provide narcotics due to the previous suicide attempts.  (Tr. at 502.)

On March 23, 2010, plaintiff saw Dr. Ostman, complaining of left gluteal pain and low

back pain.  She indicated that since he had last seen her she was quite well until a few weeks

ago when the pain got very acute again.  Any activity caused significant discomfort.  Dr.

Vasquez had tried Prednisone, which did not help.  (Tr. at 352, 391, 623.)  On exam, she was

forward stooped with an antalgic gait.  Straight leg raising was negative.  Dr. Ostman assessed

low back pain and left gluteal pain, with a worsening of her connective tissue pain.  He noted

that physical therapy helped significantly the previous year.  He started her on Cyclobenzaprine

and Ultram (a narcotic like pain reliever)[21] and referred her for physical therapy.  (Tr. at 353,

333, 392-93, 624-25.)  She went to therapy on April 1 but was unable to compete the

evaluation secondary to pain.  (Tr. at 338-41, 389-90, 556-57.)[22]

On April 8, 2010, plaintiff returned to Dr. Ostman, complaining of left posterior leg pain.

She noted that Hydrocodone and Cyclobenzaprine helped some, but she continued to have

---

[21]http://www.drugs.com/ultram.html.

[22]On June 3, 2010, the therapist discharged plaintiff from PT, indicating that after the evaluation plaintiff was referred back to the pain clinic, where an injection was done.  Plaintiff did not return to therapy after the injection.  (Tr. at 558.)

symptoms. (Tr. at 319, 385, 620.) On exam, Dr. Ostman noted stooped posture and antalgic gait. Dr. Ostman assessed left S1 neuropathy, suggesting Medrol Dosepak in addition to her current medications, then an epidural steroid injection. (Tr. at 320, 325, 386, 621.) On May 7, plaintiff reported no change in her pain with an oral prednisone trial. (Tr. at 381, 616.) On exam, posture was normal and gait improved. Dr. Ostman administered a lumbar epidural injection. (Tr. at 315-17, 381-84, 617-19.)

On May 26, 2010, plaintiff returned to Dr. Ostman, indicating that the injection helped minimally, but she continued to have pain with walking and most activities. (Tr. at 378, 613.) She reported being laid off from work and planned to go back to school. On exam, pain behavior was absent, posture fair, and gait antalgic. Straight leg raise was negative. Dr. Ostman indicated that, objectively, she was improved, but subjectively she reported minimal improvement of pain. He increased her Hydrocodone and scheduled another injection (Tr. at 379, 614), which he administered on June 10. (Tr. at 376-77, 611-12.)

On June 29, 2010, plaintiff told Dr. Ostman that since the second injection her pain was more centralized, mainly above the knee. She no longer had numbness and pain in the foot. She had tried a Fentanyl patch but developed a rash. (Tr. at 608.) Dr. Ostman noted that plaintiff was somewhat improved and started her back on physical therapy because of gluteal pain. (Tr. at 609.)

On July 30, 2010, plaintiff was seen for a physical therapy evaluation, with severely limited range of motion secondary to pain. She was to be seen for lumbar traction, therapeutic exercises, postural training, and a home exercise program. (Tr. at 435.) Plaintiff reported back pain since 1996, but this past spring noticed an exacerbation on the left side. She indicated that her left leg lacked strength and would give out. She rated her pain 5/10 at rest, 9/10 with

activity.  She was at the time a student, on summer break.  (Tr. at 553-54, 568-69.)

Plaintiff also saw Dr. Whelan on July 30, 2010, with a number of non-specific complaints, such as anxiety that had persisted for years.  Her mood changes persisted despite being on Lamictal.  Dr. Whelan found it likely she had a personality disorder as a primary diagnosis, which would be relatively unaffected by changes in medications.  Dr. Whelan recommended counseling.  He deferred any anti-anxiety meds, as it was already difficult for her to get out of bed in the morning.  Plaintiff also reported some compulsive habits.  Dr. Whelan diagnosed OCD, recurrent depressive disorder versus bipolar disorder, and PTSD traits, with a GAF of 65.  (Tr. at 539, 683.)  He prescribed Buspar, Lamictal, Citalopram, and Trazodone.  (Tr. at 540, 684.)

On August 10, 2010, plaintiff returned to Dr. Ostman with a chief complaint of left posterior leg pain.  Generally, she had responded well to epidural steroid injections with relief of symptoms for several months, but that had not happened this time following the injections in May and June 2010.  Since last seen, she had started therapy but still had pain down the left posterior leg.  (Tr. at 564, 605.)  After discussing options, plaintiff elected to proceed with a neurosurgical consultation.  (Tr. at 565, 606.)

On September 16, 2010, plaintiff saw Dr. K.S. Paul for the evaluation.  (Tr. at 584.)  On exam, he noted normal gait, full neck movements, and no tenderness of the cervical spine. However, back movements were restricted and painful both in flexion and extension.  She also had tenderness of the lumbar spine.  Examination of mental status was normal, with no anxiety, depression, or agitation.  (Tr. at 586.)  Dr. Paul ordered MRIs of the lumbar and cervical spine. (Tr. at 587.)

On September 23, 2010, plaintiff was discharged from physical therapy after attending

24

a total of six sessions.  (Tr. at 571-75.)  Overall, she noted no reduction in pain.  (Tr. at 571.)

She was given a home exercise program and advised to follow up with Dr. Paul.  (Tr. at 572.)

On October 6, 2010, Janis Byrd, M.D., evaluated plaintiff's case for the DDS on the

instant application, finding plaintiff restricted to light work, with position changes due to pain.

(Tr. at 87-88.)  Eric Edelman, Ph.D., evaluated plaintiff's mental capacity for the DDS, finding

moderate restriction of activities of daily living; mild difficulties in social functioning; mild

difficulties in maintaining concentration, persistence, and pace; and no repeated episodes of

decompensation of extended duration.  (Tr. at 85-86.)  He concluded that she remained

capable of performing the basic mental demands of unskilled work.  (Tr. at 90.)

On October 8, 2010, plaintiff underwent the MRIs of the cervical and lumbar spine

ordered by Dr. Paul.  The cervical scan revealed multi-level degenerative changes, most

significant at C6-C7, possibly explaining plaintiff's left-sided neck and left arm pain.  (Tr. at 580-

81.)  The lumbar scan revealed slight worsening of the large broad based disc extrusion at L5-

S1.  (Tr. at 582.)  Plaintiff saw Dr. Paul on October 13 to discuss the findings.  They decided

to leave the cervical area alone since her symptoms were not so bad, but they discussed

surgical options regarding her lumbar spine.  (Tr. at 588.)

On October 15, 2010, plaintiff discussed the matter with Dr. Ostman, indicating that she

was unsure if she wanted to proceed with surgery with Dr. Paul.  (Tr. at 602.)  Dr. Ostman

renewed her Oxycodone and Cyclobenzaprine medications, and provided a sample of Lyrica.

(Tr. at 603.)

On October 27, 2010, plaintiff saw Marianne Niles, Ph.D., through the Fond du Lac

County Department of Community Programs for outpatient therapy services.  Dr. Niles

identified depressed mood and anxiety related to chronic pain, approaching back surgery, and

25

bipolar diagnosis as areas needing therapeutic intervention. Plaintiff also reported a problem with alcohol, involving daily consumption of one or more drinks; she stated that all of her overdoses involved alcohol abuse. She reported symptoms of depressed mood, anxiety, paranoia, phobias, difficulty maintaining employment, and sleep and appetite disturbance. She denied obsessions or compulsions, hallucinations or delusions, and suicidal ideation or intent. Her mood during the intake interview was moderately dysphoric and anxious, and her affect was moderately flat/blunted. She was taking narcotic pain medication for her back, which may have affected her facial responsiveness. (Tr. at 685.) Dr. Niles observed plaintiff to be oriented x3, cooperative, and coherent. No obvious problems with recent or remote memory were noted. (Tr. at 686.) Dr. Niles planned weekly individual outpatient psychotherapy, diagnosing depressive disorder, not otherwise specified ("NOS"); rule out major depression, recurrent; rule out bipolar affective disorder; and chronic back pain. (Tr. at 687.)

On November 3, 2010, plaintiff returned to Dr. Ostman, noting that her pain had been quite severe that summer, but now it was better. Since her last visit, she had improved and was considering whether she should have surgery with Dr. Paul. They reviewed the recent MRI, and the posterior part of the L5-S1 bulge was somewhat less than before. (Tr. at 597.) On exam, pain behavior was absent and gait fairly normal, but straight leg raising was positive on the left side. Dr. Ostman continued her on Oxycodone and Lyrica while she considered surgery. (Tr. at 598.)

On December 2, 2010, at about 2:00 a.m., plaintiff went to the ER after slicing her arm while cutting a watermelon. (Tr. at 635.) Doctors cleaned and sutured the wound, and discharged her home. (Tr. at 637.) On December 2, 2010, at 4:11 p.m., plaintiff called for a refill of Oxycodone, stating that she had an appointment with Dr. Paul on December 17 and

26

was considering surgery in January or February 2011 as her pain had been increasing. (Tr. at 601.)

On January 21, 2011, plaintiff saw Dr. Whelan, indicating that it was hard to get out of bed. She had been in the hospital again for another cutting episode recently, with several previous hospitalizations for overdoses. She occasionally went to support groups. She complained of non-specific ticking or twitching, but she did not want to reduce Citalopram dosing when Dr. Whelan suggested it might help. Her mood change persisted despite 200 mg of Lamictal per day. Dr. Whelan believed that she probably had a personality disorder as a primary diagnosis, which would be relatively unaffected by changes in medication. Dr. Whelan diagnosed OCD, recurrent depressive disorder v. bipolar disorder, and PTSD traits, with a current GAF of 65. (Tr. at 678.) He continued Buspar, Lamictal, Citalopram, Trazodone, and Clonazepam. (Tr. at 679.)

On January 27, 2011, plaintiff saw Dr. Niles, who noted that she appeared to be in pain as she moved from the hallway into the therapy room. She indicated that she would be having back surgery in February. They also discussed issues with her daughter and boyfriend. She appeared to be focusing her energy on cleaning and straightening, and expected tidiness from her teenage daughter. Her mood was moderately dysphoric and anxious, and her affect moderately blunted/flat. Some psycho-motor retardation was observed, although this may have been related to narcotic medication and/or daily alcohol consumption. Plaintiff denied suicidal ideation or intent. (Tr. at 677.)

Plaintiff returned to Dr. Niles on February 17, 2011, indicating that she was scheduled for surgery on February 24. She worried about keeping the house clean during her recovery and about her finances, as she recently lost rental assistance after her boyfriend moved in

27

contrary to the rules. She reported an increase in depressed mood, tearfulness, and irritability. The therapist noted that plaintiff had some very valid concerns that could be playing a significant role in her mood symptoms. Her mood during the session was moderately dysphoric, and her affect was sad and tearful. She denied suicidal ideation or intent. (Tr. at 676.)

On February 23, 2011, plaintiff underwent a lumbar laminectomy and posterior fusion at L5-S1 with Dr. Paul. (Tr. at 638-40.)

On March 9, 2011, Dr. David Kamper completed a physical RFC assessment report for the DDS, finding plaintiff capable of light work with occasional stooping and crouching. (Tr. at 641-48.) Dr. Kamper surveyed plaintiff's treatment,[23] with exams noting normal strength and gait, mild difficulty with toe/heel walking, negative SLR tests for most exams, and decreased lumbar range of motion. Epidural injections and physical therapy did not help. She was able to do activities at home, but it appeared her limitations were primarily related to depression. Dr. Kamper found that the evidence did not show that plaintiff's gait was significantly limited, and leg pain was intermittent. She had no weakness in the upper extremities. Given all of her impairments, Dr. Kamper assigned an RFC for light work with occasional stooping/crouching. He further concluded that her statements regarding her symptoms and limitations were out of proportion when compared to the exam findings and were only partially credible. (Tr. at 646.)

On March 11, 2011, Roger Rattan, Ph.D, prepared a psychiatric review technique report for the DDS, finding moderate restriction of activities of daily living; mild difficulties in

---

[23]Dr. Kamper indicated that plaintiff had a consult with a neurosurgeon but had not scheduled surgery. (Tr. at 646.) As indicated in the text, plaintiff had the surgery shortly before Dr. Kamper prepared his report.

maintaining social functioning; moderate difficulties in concentration, persistence and pace; and no episodes of decompensation. (Tr. at 649, 659.) In an accompanying mental RFC report, he found moderate limits in carrying out detailed instructions, maintaining attention and concentration for extended periods, performing activities within a schedule, accepting instructions and responding appropriately to criticism, and responding appropriately to changes in the work setting. He found no significant limitations in the other areas. (Tr. at 663-64.) In the narrative section of the report, Dr. Rattan noted brief hospitalizations in April 2008 and March 2009 for overdosing with medications and for detox. She was evaluated in June 2009 by Dr. Pierquet, with a diagnosis of polysubstance dependence and bipolar disorder. She was evaluated again in March 2010 by Fond du Lac County and diagnosed with OCD, depressive disorder, and PTSD, and prescribed Buspar, Citalopram, and Lamictal. Her MD noted in July 2010 that she had no improvement in depression with Lamictal, so a personality disorder was a more appropriate diagnosis, and she was referred for counseling. During the neuro consult for her back in September 2010, she was noted to have a normal mood. Although the primary issue in 2009 was alcohol abuse, exams since then noted no signs of substance abuse, and her memory and attention had been normal. Plaintiff's August 2010 function report indicated that she had ongoing paranoia, social withdrawal, moodiness, forgetfulness, irritability, anxiety, and difficulty handling stress. She also reported symptoms of OCD. Dr. Rattan found her complaints of significant anxiety and depression less than credible since there were no comments from other doctors indicating her mood disturbance, in addition to the lack of ongoing treatment recently. Therefore, he found only moderate limitations in concentration/persistence/pace and daily activities, with mild limits in social functioning. (Tr. at 665.)

On March 19, 2011, plaintiff was subjected to a 72-hour detention after she was found unconscious by her daughter. She said she took too much medication. (Tr. at 680.) The emergency detention referenced depression and suicidal ideation (Tr. at 680), but on intake to the Unit, she denied both (Tr. at 688). On admission, she denied an overdose but admitted drinking. (Tr. at 690.) Her diagnoses on admission were alcohol dependence, marijuana dependence, dysthymia, and borderline personality disorder, with a GAF of 50 to 60. She was to be observed carefully and evaluated further and her medications readjusted; she did not appear to be in need of long-term hospitalization. (Tr. at 691.) During her stay, plaintiff indicated that she experienced a reaction between recently prescribed Benzodiazepine for insomnia and alcohol she drank. She stated that she was not aware she had been overdosing. She denied any suicidal plan and reported her mood had been okay. (Tr. at 688.) Her final diagnoses on discharge were polysubstance dependence, depression, and borderline personality disorder, with a GAF of 60. It was recommended that she discontinue Benzodiazepine and comply with previously prescribed medications of Metoprolol and Lamictal. She was to see Dr. Whelan and Dr. Niles. Finally, it was recommended that she seek AODA treatment and stop drinking and drug use. (Tr. at 689.)

On April 6, 2011, plaintiff saw Dr. Whelan, who noted that shortly after her discharge from the acute unit she called and requested more Clonazepam,[24] which request was denied because she had overdosed on that medication. Her chief complaint was depression and feeling suicidal. She seemed not to pay attention to boundaries and restrictions, common to her borderline personality disorder diagnosis. She had overdosed numerous time over the

---

[24]Clonazepam, a type of benzodiazepine, is used to treat seizure disorders or panic disorder. http://www.drugs.com/clonazepam.html.

years. She was applying for social security for the fourth time. She recently had surgery on her back and seemed a little stiff and slow getting up from the chair but otherwise had full range of motion and strength. She had given up on school online. Both she and her boyfriend were on unemployment, although it was initially denied. Her anxiety had persisted for years, with or without Clonazepam. Dr. Whelan indicated that she probably had a personality disorder as a primary diagnosis. She was a little compulsive about doorknobs, toilets, washing her hands, and dirty dishes. She displayed no suicidality or homocidality but did have a somewhat puzzled, vacant, dysthymic expression on her face. (Tr. at 674.) Dr. Whelan diagnosed OCD, recurrent depressive disorder v. bipolar disorder, borderline personality disorder, and PTSD traits, with a GAF of 65. (Tr. at 674-75.) He continued her on Trazodone, Lamictal, and Buspar, but did not renew Citalopram. (Tr. at 675.)

On June 3, 2011, plaintiff returned to Dr. Ostman, with continued back pain. Since last being seen in November 2010, plaintiff underwent lumbar fusion surgery with Dr. Paul. Her back had been quite sensitive since then. She also reported a burning type of pain in her foot and pins and needles in her low back. She indicated it was somewhat better than before, but she still could not function with the pain. (Tr. at 733.) Her gait was somewhat antalgic and range of motion of the lumbar spine minimal without pain. The surgical scars seemed to be healing well but with some localized edema. Dr. Ostman refilled plaintiff's Lyrica and Oxycodone, and started her on Tizanidine.[25] He also urged her to quit smoking to aid in the healing of her fusion. (Tr. at 734.)

On June 16, 2011, plaintiff saw Dr. Kathy Kowalke, a psychiatrist with Fond du Lac

---

[25]Tizanidine is a short-acting muscle relaxer used to treat spasticity by temporarily relaxing muscle tone. http://www.drugs.com/tizanidine.html.

County, on transfer from Dr. Whelan, reporting increased depression and anxiety for a few months. She also reported mood swings. Two nights ago she had a physical altercation with her daughter and spent a night in jail. She denied suicidal ideation but did report cutting herself. She admitted daily alcohol use, as well as cannabis. Sleep was generally good, with occasional Trazodone use when she did have insomnia. She had trouble listing all of her medications. She presented with good grooming and appropriate dress, at least superficially cooperative. Eye contact was fair to good, speech and motor activity unremarkable. Mood was depressed and anxious, and affect somewhat depressed and tearful at times, but with no significant anxiety. Thought process was goal directed, with no psychosis, suicidal or homicidal ideation. (Tr. at 743.) Dr. Kowalke diagnosed depression NOS, personality disorder NOS, rule out borderline personality disorder, and polysubstance abuse. Dr. Kowalke added Cymbalta and discontinued Citalopram. Plaintiff was to review her medications and leave a message regarding whether she was taking Clonazepam. Dr. Kowalke checked with the pharmacy, learning that plaintiff had just picked up a supply of Clonazepam on May 31, 2011. Dr. Kowalke canceled the remaining refills. Records indicated that a request by plaintiff for Clonazepam was denied on March 30, 2011, due to plaintiff having previously overdosed on it. (Tr. at 744.)

On June 23, 2011, plaintiff saw Dr. Niles for therapy, reporting her recent arrest for disorderly conduct following the physical altercation with her daughter. Plaintiff also discussed her chronic back pain and pain from a fractured rib from the fight with her daughter. She reported continuing to take three to five Vicodin tablets per day, down from larger doses. She was trying to wean herself from the pain medication. Her mood was mildly dysphoric and her affect moderately blunted. She reported daily mood fluctuations but denied suicidal ideation

or intent.  (Tr. at 746.)

On July 1, 2011, plaintiff returned to Dr. Ostman, with continued back pain since the surgery.  Since last seen on June 3, 2011, Dr. Ostman had continued plaintiff's Oxycodone, Lyrica, and Tizanidine.  However, plaintiff was very confused about what medications and what quantities she was taking.  She was not clear about how many Oxycodone she took.  She also complained of some swelling.  (Tr. at 730.)  On exam, gait was improved since last time.  Dr. Ostman asked plaintiff to bring in all of her medication so they could determine her use.  (Tr. at 731.)  Plaintiff returned on July 6, having collected all her drugs and shared those with Dr. Ostman in the clinic.  He also did a urine screen, which showed no trace of any opioids (or any street drugs), leading to the conclusion that she was not taking the Oxycodone as directed. (Tr. at 727.)  On exam, pain behavior was absent, gait normal, and transfers quick.  Dr. Ostman noted that plaintiff took substantial amounts of different psychiatric medications for her depression and bipolar disorder.  Dr. Ostman stopped Lyrica and now Oxycontin because he could not find it in her urine.  Plaintiff still was not as clear-headed as she used to be, and the issue was whether this was a drug effect problem or something else.  Dr. Ostman called Dr. Vasquez about this, and she was to see plaintiff for screening her drugs.  (Tr. at 728.)

On July 15, 2011, plaintiff saw Dr. Niles, indicating that she recently went through withdrawal from Oxycontin, which her doctor refused to continue.  She reported nausea, tremors, and headache.  However, she did appear more alert with clearer speech and better ability to track conversation.  She reported getting along better with her daughter and boyfriend. Her mood was mildly dysphoric and congruent to the contact of her speech.  (Tr. at 745.)

On July 19, 2011, plaintiff returned to Dr. Kowalke bringing in her medication bottles for review.  She reported not taking any Clonazepam.  She remained on Lamictal, Buspar, and

Trazodone. She had been detoxing from narcotics, as additional prescriptions had been refused. She reported no alcohol or illicit drug use. She was no longer on Lyrica as it caused swelling. She reported her mood was quite variable from happy to angry to sad. Sleep was more disturbed since she was off narcotics, although Trazodone helped somewhat. On exam, she was cooperative and pleasant with good eye contact. Speech and motor activity were unremarkable, and affect slightly anxious. Dr. Kowalke diagnosed mood disorder NOS, personality disorder NOS, rule out borderline personality disorder, history of polysubstance abuse versus dependence, and current narcotic withdrawal. Dr. Kowalke increased the Trazodone and Lamictal doses, and continued Buspar, and encouraged plaintiff to continue in individual therapy and remain abstinent from any use of alcohol, illicit drugs, or narcotics. (Tr. at 742.)

On July 22, 2011, plaintiff returned to Dr. Paul for follow up. After the surgery her back and leg pain improved, but she was still getting a lot of back pain and pain going down her left leg. A repeat MRI showed good position of the interbody cage and pedicle screw. (Tr. at 696.) Dr. Paul saw some scar tissue, as expected, which he believed was giving her pain and discomfort. Dr. Paul indicated that he wanted to wait six months before starting physical therapy. In the meantime, he suggested she be given Tramadol or some other non-narcotic pain medication. He also recommended an epidural steroid injection to see of this resolved her symptoms. (Tr. at 696.)

On August 17, 2011, plaintiff saw Dr. Kowalke, reporting that she had been compliant with the increased dose of Lamictal. She felt her mood had been better. She also continued with Buspar. She sometimes had trouble with sleep, but the Trazodone made her feel uncomfortable, perhaps slightly more anxious. Overall, she described her anxiety as high, with

34

panic symptoms, shortness of breath, and palpitations.  She also described some agoraphobia.  She denied any alcohol or illicit drug use.  She occasionally had some tremor and paresthesia of the left upper and lower extremity.  Dr. Kowalke diagnosed mood disorder NOS, anxiety NOS, rule out panic with agoraphobia, personality disorder NOS, and history of polysubstance abuse/dependence.  She continued plaintiff on Trazodone, Lamictal, and Buspar, adding Paroxetine, an anti-depressant,[26] to see if this addressed anxiety symptoms.  (Tr. at 741.)

On September 1, 2011, plaintiff saw Dr. Niles for therapy, with more back pain lately after she lifted something too heavy.  She moved slowly, but much less so than before her surgery.  She had spent four days in Michigan with her daughter and ex-husband and seemed to enjoy the trip.  She indicated that her relationship with her daughter had improved.  Dr. Niles noted improved affect, concentration, and ability to participate in conversations now that she was off narcotics.  Her mood was mildly dysphoric, and her affect was normal in range and character.  (Tr. at 740.)

On September 14, 2011, plaintiff saw NP Michels for management of chronic low back pain.  Michels had briefly seen plaintiff in 2009 for carpal tunnel syndrome, and plaintiff had contacted her office wanting to be seen for back pain issues.  Dr. Ostman had tried various medications, and plaintiff seemed confused about exactly what medications she was taking and the proper doses.  She had been on Oxycodone, but it was discontinued by Dr. Ostman in July.  She had not taken pain medications since then.  Per Dr. Ostman's note, her Lyrica and Oxycodone were discontinued because they did not show up in her urine.  Plaintiff complained of intense lower back pain with numbness and tingling down the left leg.  (Tr. at 711.)  On

---

[26]http://www.drugs.com/paroxetine.html.

35

exam, she had a very flat affect and an antalgic, slow gait, but she walked without a limp. She was able to heel and toe walk with no evidence of weakness. She had virtually no lumbar flexion, extension, or lateral bending without pain. She was highly sensitive to even light palpation of the lumbar and gluteal muscles. Muscle strength testing was 5/5 in the lower extremities. Deep tendon reflexes were 1/4 at the knees and ankles. Straight leg raise was negative bilaterally. Michels recommended a trial of Gabapentin and provided a referral for a TENS unit. Plaintiff asked about getting additional pain medication, specifically mentioning Tramadol, but Michels held off on that. (Tr. at 712.)

On September 23, 2011, plaintiff returned to NP Michels, after phoning the office the previous day to ask for pain medication because she fell on September 17 when her left leg gave out. She was treated in Convenient Care and given a few Vicodin; she called the previous day for a refill of Vicodin. Michels indicated that she had just recently started seeing plaintiff, and that plaintiff had been taken off Oxycodone by Dr. Ostman because of a negative urine screen. On exam, she was pleasant, alert, and oriented, in no acute distress. She did look slightly anxious in the office, with a flat affect. She transferred slowly from seated to standing, and ambulated slowly. She had diminished lumbar range of motion in all planes. Muscle strength testing was 5/5 in the lower extremities. Straight leg raising was slightly positive. (Tr. at 709.) An x-ray taken on September 17 showed that the fusion was intact and vertebral body heights and alignment well maintained. Michels prescribed a refill of Cyclobenzaprine for muscle spasms and a two week supply of Nabumetone. Plaintiff did not specifically ask for opioids during the session, and none were provided. (Tr. at 710.)

On October 18, 2011, plaintiff returned to Dr. Ostman, with continued low back pain. (Tr. at 704, 725.) She had been seen by Dr. Paul, who wanted her to have an epidural

injection to see if this would help the pain. (Tr. at 725.) On exam, gait was normal and transfers quick. While standing, she had normal posture. She had significant soft tissue edema over the surgical site. Flexion was 20 degrees, extension minimal, and facet loading also caused significant pain. (Tr. at 726.) Dr. Paul wanted Dr. Ostman to do one epidural injection (Tr. at 705), which Dr. Ostman performed three weeks later (Tr. at 702-03, 723-24).

On October 26, 2011, plaintiff saw Dr. Niles for therapy, indicating that she was getting along better with her daughter but not her boyfriend. She reported increased anxiety with panic symptoms and a tendency to isolate at home. They discussed treatment for anxiety, with plaintiff disappointed there was no medication to remove the problem. Her mood was mildly dysphoric and her affect moderately nervous and frightened. She denied suicidal ideation or intent. (Tr. at 739.) Plaintiff returned to Dr. Niles on November 11, reporting continued back pain and frustration with her progress. She reported mild improvement in her relationship with her daughter and boyfriend. She also reported mild improvement in her mood, although her anxiety remained high. She still preferred to stay in the house. Her mood was mildly dysphoric and anxious. Her affect was nervous and mildly blunted. She denied suicidal ideation or intent. (Tr. at 738.)

On November 22, 2011, plaintiff saw Dr. Paul, reporting little improvement after the recent epidural injection. The last MRI scan had been done about six months ago and her symptoms were still persisting so Dr. Paul ordered another to see if there was any compression of nerve roots which may be causing her symptoms. He also ordered lab work, which ruled out an infection. (Tr. at 698.) A November 22 x-ray revealed no acute findings. (Tr. at 701.) The November 30 MRI revealed post-operative changes status post L5-S1 fusion. The scan also revealed two fluid collections contacting the bilateral traversing S1 nerve roots. (Tr. at 699.)

Plaintiff returned to Dr. Paul on December 6, still with back and left lower limb pain. The repeat MRI showed fluid collection just posterior to the S1 nerve root, which could be causing her pain. Before considering further surgery, Dr. Paul wanted to confirm that the pain was coming from the left S1 nerve root and so sent her to Dr. Ostman for a selective S1 nerve root block to see if S1 nerve root compression or irritation was the cause for her pain. (Tr. at 697.)

On December 21, 2011, plaintiff saw Dr. Ostman, with axial low back pain and neuropathic left posterior S1 pain. (Tr. at 720.) On exam, her gait was normal but transfers antalgic. Straight leg raising was somewhat positive on the right side. Plaintiff could not lay prone, and she had significant pain over the surgical sites on both sides. Dr. Ostman assessed post-laminectomy pain and left S1 neuropathy. He scheduled the diagnostic left S1 nerve block requested by Dr. Paul pending approval. Plaintiff again brought up pain medication usage, but Dr. Ostman believed this was best evaluated by NP Michels, like previously. (Tr. at 721.)

On December 29, 2011, plaintiff saw NP Michels for management of ongoing low back and left leg pain. She was awaiting insurance approval for a selective nerve root injection. Plaintiff had called the office the previous week asking for additional pain medication, reporting increased pain with daily activities including doing dishes, laundry, and light housework. She had been using a TENS unit, which she found beneficial. NP Michels refilled Cyclobenzaprine and Gabapentin. Plaintiff wanted pain pills, and Michels provided a limited amount of Tramadol as a rescue medication. (Tr. at 707.)

On January 13, 2012, plaintiff saw Dr. Niles for a therapy session. She expressed frustration over her slow recovery from back surgery. However, she reported that her relationship with the daughter had improved since she stopped taking sedative pain

medication.  Her moods were better regulated with the medications prescribed by Dr. Kowalke, and she was not drinking alcohol.  Her mood was brighter than in the past but not hypomanic. Her affect was pleasant and congruent to the context of her speech.  (Tr. at 736.)

On January 29, 2012, plaintiff returned to Dr. Ostman, with continued low back and left posterior leg pain.  (Tr. at 717.)  On exam, gait was very good and transfers quick.  Muscular coordination, range of motion in the hip joint, and strength were all good.  Manual examination revealed that most of the pain was in the soft tissues, the gluteal muscles, and the low back. Straight leg raising was negative bilaterally.  Dr. Ostman assessed post-laminectomy syndrome, connective tissue pain, and chronic left S1 neuropathy.  He noted that plaintiff was actually improved from last month.  There was no irritation in the S1 nerve root with tension testing.  Most of her pain was in the muscular and connective tissues.  Plaintiff came in at the request of Dr. Paul for a left S1 foraminal epidural steroid injection, which was done.  Dr. Ostman asked plaintiff to discuss physical therapy with Dr. Paul, as Dr. Ostman wanted to work on plaintiff's muscles with therapy to try to soften that aspect of the pain.  He concluded that the S1 neuropathy probably was permanent already from before the surgery.  (Tr. at 718.)

B.    **Procedural History**

1.    **2010 Application**

On July 1, 2010, plaintiff filed the instant application for benefits, alleging a disability onset date of January 1, 2004.  (Tr. at 157.)  In a function report, plaintiff indicated that she made supper, did dishes, used the computer, and watched TV.  Some days she did nothing but lay in bed or on the couch.  (Tr. at 206.)  She cared for her daughter, cooking for her and taking her to school, and for her cats, feeding them and cleaning the litter box.  Her daughter

and boyfriend sometimes helped with the cats. She had difficulty dressing due to pain. (Tr. at 207.) She did laundry, ironing, dusting, and dishes (Tr. at 208), but mopping, vacuuming, and mowing the lawn hurt her back. She was able to shop in stores but sometimes did not want to be around people. (Tr. at 209.) She sometimes visited with her mother and grandmother. (Tr. at 210.) Other times she did not want to leave home. She could lift 5-10 pounds and walk half a block; squatting or bending hurt. She could pay attention for 5-10 minutes and did not follow instructions well. (Tr. at 211.) Nor did she handle stress or changes in routine well. (Tr. at 212.)

The SSA denied the application initially on October 8, 2010 (Tr. at 65, 97), and on reconsideration on March 11, 2011 (Tr. at 93, 109). Plaintiff then requested a hearing before an ALJ.

### 2. The Hearing

On February 16, 2012, plaintiff appeared with counsel for her hearing before the ALJ. (Tr. at 32.) Plaintiff's counsel asked to amend the onset date from January 1, 2004, to January 1, 2008, given the limited medical evidence going back to 2004. (Tr. at 36.)

#### a. Plaintiff

Plaintiff testified that her date of birth was November 6, 1970. She lived with her 15 year old daughter and her boyfriend, Dan Snyder. She had no regular monthly income other than some child support. (Tr. at 39.) She had a driver's license but rarely drove due to panic attacks. (Tr. at 39-40.) She was a high school graduate with some post-secondary education as a teacher's assistant. She indicated she was unable to complete her degree due to panic attacks, her back surgery, and being unable to walk properly. (Tr. at 40.)

Plaintiff testified that from January 2004 to January 2008 she was employed as a child-care worker, which involved feeding, lifting the children (averaging 40-50 pounds, Tr. at 52), and changing diapers. She indicated that she ended up not being able to do this work because of her back. She then started caring for older children but was dismissed for missing too much work. She indicated that she had not worked since January 2008, but she did receive unemployment compensation in 2009, 2010, and 2011. (Tr. at 41.) The ALJ noted that in order to receive unemployment a person had to certify that she is able to work and asked plaintiff to explain the contradiction. (Tr. at 41-42.) Plaintiff indicated that she did not have any income, and that she did not think she would be able to find a job due to her conditions. (Tr. at 42-43.) She indicated that she looked in the paper for jobs but did not see anything she thought she could do. (Tr. at 43.)

Asked what prevented her from working, plaintiff indicated that she experienced back pain for many years. Before the surgery, she underwent physical therapy and injections. (Tr. at 43.) She also referenced her bipolar disorder and anxiety, which made it so that she did not want to leave the house unaccompanied. (Tr. at 43-44.) Even after the surgery, she continued to experience pain and numbness in her left leg. For her pain, she took Gabapentin and Cyclobenzaprine. The medication upset her stomach and did not relieve the pain, although it did relax her muscles. (Tr. 44.) For her mental illness, she took Lamotrigine (Lamictal) and Cylopam, which did not seem to help. (Tr at 44-45.) She indicated that she no longer used marijuana and rarely drank. (Tr. at 45.) She stated that she could sit for 10-15 minutes before she had to stand up, stand for 15-20 minutes before she had to sit down, and walk about ½ block. She could lift a gallon of milk. (Tr. at 47.)

Regarding her daily activities, plaintiff indicated that her doctor did not want her to do

even light housework; she had help caring for her cats.  Her daughter was 15, and she and plaintiff's boyfriend were able to help with preparing meals.  Plaintiff said she spent her time doing word searches, reading magazines, and sleeping.  (Tr. at 48.)  She helped with dishes, feeding the cats, and preparing some meals.  (Tr. at 49.)

Plaintiff further testified that she experienced crying spells and feelings of worthlessness, which caused difficulty concentrating.  (Tr. at 49.)  She also complained of severe daily headaches.  (Tr. at 51.)  She also continued to have problems with her wrists related to carpal tunnel syndrome, mainly the left.  (Tr. at 51.)

### b. Plaintiff's Boyfriend

Plaintiff's boyfriend, Dan Snyder, testified that he had been with plaintiff for 4 ½ years. (Tr. at 53.)  He observed that she did not go out in public and liked to stay home.  She rarely went out alone due to anxiety.  (Tr. at 54.)  He also noticed fluctuating moods.  (Tr. at 54-55.) He did most of the work around the house.  (Tr. at 55.)

### c. Vocational Expert

The ALJ also summoned a vocational expert ("VE"), Les Goldsmith, who classified plaintiff's past employment as a child-care worker as medium, semi-skilled, work.  (Tr. at 57.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, limited to light work, which was unskilled; with a sit/stand option, changing positions every 30 minutes; only occasional stooping and crouching; and limited to simple, routine, repetitive tasks, in a low stress work environment, meaning free of fast-paced production requirements and involving only simple work-related decisions with few, if any, work place changes.  (Tr. at 58.)  The VE testified that such a person could not perform plaintiff's

past work but could perform other jobs in production, packaging, office help, and security. (Tr. at 58.) If the person needed the ability to change positions at will, the production and assembly jobs would remain but the office job would be eliminated. (Tr. at 58-59.) If the person could only occasionally interact with others – co-workers and the public – the jobs would not be affected. Dropping the exertional level to sedentary, the assembly and packaging jobs would remain, as would the office job; security jobs would remain but at a reduced number. (Tr. at 59.) The VE further testified that employers would not tolerate three unscheduled breaks per day, nor would they accept two or more absences per month on a consistent basis. (Tr. at 61.) Being off task 10% of the day would be acceptable, more than that would not. (Tr. at 62.)

### 3. ALJ's Decision

On March 15, 2012, the ALJ issued a comprehensive decision denying plaintiff's application. Following the familiar five-step sequential evaluation process,[27] the ALJ concluded that plaintiff failed to establish disability at any time from January 1, 2004 through the date of decision.[28] (Tr. at 23.)

At step one, the ALJ concluded that plaintiff had not engaged in substantial gainful activity ("SGA") since January 1, 2004, the alleged disability onset date. While she had worked

---

[27]Under this process, the ALJ asks: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) if not, whether she has a severe impairment or impairments; (3) if so, whether any of the claimant's impairments qualify as conclusively disabling under the Listings; (4) if not, whether the claimant retains the residual functional capacity ("RFC") to perform her past relevant work; and (5) if not, whether the claimant can, given her age, education, work history, and RFC, perform any other work in the national economy. See 20 C.F.R. § 404.1520(a)(4).

[28]As indicated above, at the hearing plaintiff amended the alleged onset date to January 1, 2008, but the ALJ analyzed the claim back to 2004. Plaintiff does not raise this as an issue in this court.

since that time, her earnings did not rise to SGA levels. (Tr. at 15.) At step two, the ALJ found that plaintiff suffered from the severe impairments of degenerative disc disease, status post back surgery; depression/bipolar disorder and anxiety; and history of alcohol and marijuana use. (Tr. at 15.) The record contained evidence of carpal tunnel syndrome, but tests results indicated that it was only of mild severity. Plaintiff also underwent intelligence testing, which produced results in the borderline range. However, plaintiff did not allege either of these conditions as impairments and reported no limitations attributable to them. The ALJ thus found them non-severe. (Tr. at 16.)

At step three, the ALJ found that plaintiff did not meet or equal a Listing. He specifically considered Listing 1.04, pertaining to spine disorders, finding that the medical evidence did not establish nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis. Nor did the evidence establish that plaintiff's back disorder resulted in an inability ambulate effectively. (Tr. at 16.)

The ALJ also considered mental health Listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.09 (substance addiction disorders), finding that plaintiff did not meet the necessary criteria.[29] Specifically, he found moderate restriction of activities of daily living, based on her ability to work part-time, go to the grocery store, cook, dust, clean, watch television, and care for her personal hygiene. The ALJ noted that this was consistent with the reports from the DDS consultants, Drs. Edelman and Rattan. (Tr. at 17.) The ALJ also

---

[29]In order to be considered disabled under these Listings, the claimant must have at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked deficiencies of concentration, persistence, and pace; or (4) repeated episodes of decompensation, each of extended duration. Larson v. Astrue, 615 F.3d 744, 748 (7th Cir. 2010).

found moderate difficulties in social functioning, noting that while she was uncomfortable with unfamiliar people, plaintiff did socialize with people she knew and had daily contact with her boyfriend, daughter, mother, and grandmother. (Tr. at 17.) The consultants found mild limitations in this area, but the ALJ found that the record as a whole supported a greater limitation in her ability to interact independently, appropriately, effectively, and on a sustained basis with other people. (Tr. at 17-18.) The ALJ also found moderate difficulties in concentration, persistence, and pace. Dr. Pierquet noted intact concentration and persistent work with average pace for cognitive tasks. However, plaintiff's memory was slightly deficient. Dr. Edelman found mild limitations in this area, Dr. Rattan moderate, and the ALJ found the latter conclusion consistent with the record as a whole. (Tr. at 18.) Finally, the ALJ found no episodes of decompensation of extended duration. While defendant had been hospitalized several times related to overdoses, none were of extended duration, and plaintiff reported that her overdoses related to poor memory and not recalling when or how much medication she took. (Tr. at 18.)

The ALJ then determined that plaintiff retained the RFC for sedentary, unskilled work, allowing a sit/stand option at will; only occasional stooping or crouching; limited to low stress work, defined as no fast paced production requirements and involving only simple work-related decisions with few, if any, workplace changes; only occasional interaction with the public; and allowing her to be off-task 10% of the day, in addition to regularly scheduled breaks. (Tr. at 18-19.) In making this determination, the ALJ considered plaintiff's statements regarding her symptoms and limitations, and the medical opinion evidence. (Tr. at 19.)

As to her statements, plaintiff alleged that she experienced back pain, which caused her to lay in bed all day, as well as difficulty lifting or performing postural activities. She also stated

that her left foot went numb such that she would fall.  She took Neurontin and Flexeril for pain, which caused upset stomach but did not relieve the pain.  She also received epidural injections and used a TENS unit to decrease pain.  She further indicated that she took Lamictal and Celexa for her mental impairments, but she no longer found them effective.  She reported that she could stand for about 15-20 minutes, sit for about 10-15 minutes, walk less than ½ block, and lift a gallon of milk.  Nevertheless, she reported engaging in various daily activities, including cooking, cleaning, caring for her personal hygiene, shopping, and caring for her daughter.  (Tr. at 19.)

The ALJ noted that the medical evidence provided some support for plaintiff's allegations.  Plaintiff consistently sought treatment for her low back, including surgery.  (Tr. at 19.)  Prior to the surgery, treatment notes showed tenderness and decreased range of motion, as well as positive straight leg raise tests, indicative of radiculopathy.  She was also noted to have an antalgic gait and inability to perform a tandem walk.  She also received epidural injections for pain relief.  MRI scans of her spine showed a disc herniation at L5-S1 causing significant compression on the thecal sac and nerve root.  The April 2009 consultative evaluation with Dr. Johnson revealed positive straight leg raise, mild difficulty getting on the exam table and toe/heel walking, moderate difficulty with squatting, and inability to hop.  She underwent surgery on February 23, 2011, and a subsequent MRI showed post-operative changes with fluid collecting around the thecal sac and scar tissue.  Treatment notes revealed that she still ambulated slowly with diminished lumbar motion and slightly positive straight leg raise on the left.  The ALJ concluded that these findings supported an RFC for sedentary work with postural limitations and a sit/stand option.  Her pain and lack of concentration would also cause her to be off-task 10% of the time, in addition to regularly scheduled breaks.  However,

the ALJ found that the record did not support plaintiff's claims to the extent that she alleged even greater limitations. (Tr. at 20.)

The ALJ found that plaintiff's "objective treatment notes, activities of daily living, and the various inconsistencies in the evidence belie her allegations of disabling pain and symptoms." (Tr. at 20.) First, the ALJ noted that prior to the surgery treatment notes indicated that plaintiff's subjective complaints would remain despite objective improvement, which did not support a disabling condition. (Tr. at 20, 379.)[30] Second, Dr. Pierquet indicated that plaintiff did not need to reposition herself for pain, nor did she display any pain behavior during their exam, despite sitting for more than an hour, also inconsistent with plaintiff's allegations. (Tr. at 20-21, 290.) Third, consulting physician Dr. Paul indicated that plaintiff did not need surgery on her neck, despite evidence of degenerative changes, due to a general lack of problematic symptoms, also inconsistent with plaintiff's claims. While plaintiff did undergo surgery for her back, which would suggest that the symptoms were genuine and would normally weigh her in favor, this was offset by the fact that the surgery was generally successful in relieving the symptoms. Although positive results were not immediately apparent, less than a year later the treatment notes indicated very good gait, quick transfers, good range of motion in her hips, and good strength. Her pain was noted to mostly be in the soft tissue, with negative straight leg raise. (Tr. at 21, 718.)

Regarding her mental impairments, the ALJ noted that mental status exams were generally benign and not supportive of disabling symptoms. Dr. Paul noted that plaintiff had normal mood and affect with no anxiety, depression, or agitation. Dr. Bernadin indicated that

---

[30]The treatment note cited by the ALJ stated: "Objectively, patient is improved. . . . Subjectively, there is minimal improvement of pain." (Tr. at 379.)

plaintiff was fully oriented, pleasant, and cooperative, with intact recent and remote memory, and fair insight and judgment.  More recent notes indicated good grooming, good eye contact, and slightly anxious affect, but with occasional depression.  Plaintiff was often noted to have GAF scores between 60 and 65, indicating only mild to moderate symptoms and problems.  (Tr. at 21.)

The ALJ further noted that plaintiff's activities were not limited to the extent one would expect given her claims of pain and other symptoms.  Plaintiff reported cleaning her home, cooking, driving, and cleaning her cat litter box.  These activities did not support her claims of disabling back pain, as they required frequent bending, sitting, and stooping.  Plaintiff also reported shopping, spending time with her daughter and boyfriend, taking some college courses, and working part-time at a daycare.  These activities showed that her anxiety was not as severe as she claimed, and they involved social interaction on at least an occasional basis.  These activities also showed sufficient concentration for simple tasks.  (Tr. at 21.)

Finally, the ALJ noted some inconsistencies in plaintiff's allegations.  First, the treatment records contained drug tests that did not indicate the presence of pain medication, showing that she was not always taking the medication as directed.  This non-compliance suggested that her pain was not as severe as alleged.  Second, plaintiff had applied for and accepted unemployment benefits, which required her to make the inconsistent claim that she was able to work.  Third, plaintiff testified that she had looked for work but had not found a job.  (Tr. at 21.)

Turning to the opinion evidence, the ALJ noted Dr. Pierquet's conclusion that plaintiff could perform simple work, maintain concentration, work with supervisors and co-workers, maintain at least a part-time work schedule, tolerate stress, and work at a good pace despite

her mental impairments. The ALJ gave this opinion some weight, imposing further limitations based on additional evidence. Dr. Edelman found plaintiff capable of simple work with restrictions on working around the public. The ALJ gave this opinion some weight, as it was generally consistent with the evidence as a whole, but additional evidence warranted further restrictions. Dr. Rattan indicated that plaintiff could perform simple, unskilled work, with limitations on her ability to accept criticism from supervisors and respond to changes. The ALJ gave this opinion some weight but declined to adopt the restriction regarding supervisors as it was not supported by the objective evidence from Dr. Pierquet. Finally, the ALJ gave substantial weight to the GAF scores of 60-65, as they were from treating physicians and indicative of plaintiff's ability to function. (Tr. at 22.)

Regarding plaintiff's physical impairments, the ALJ gave some weight to the opinions from Drs. Kamper and Byrd, who indicated that plaintiff could perform light work, as they were generally consistent with the evidence. However, due to additional evidence received at the hearing level, the ALJ found additional limitations warranted. The ALJ also gave some weight to Dr. Johnson's findings, which were generally consistent with the RFC. (Tr. at 22.)

In sum, the ALJ found the RFC supported by the objective medical evidence, including the consultative examinations. The credibility of plaintiff's allegations was weakened by her daily activities, the treatment notes, and the various inconsistencies in the record. The ALJ accepted that plaintiff experienced some levels of pain and limitation but not beyond the extent set forth in the RFC. (Tr. at 22.)

At step four, the ALJ found that plaintiff could not perform her past relevant work as a child care worker, based on the testimony from the VE. (Tr. at 22.) Finally, at step five the ALJ concluded that plaintiff could perform other jobs as identified by the VE, including assembly,

49

packaging, and security jobs.  The ALJ accordingly found plaintiff not disabled.  (Tr. at 23.)

On May 15, 2013, the Appeal Council denied review.  (Tr. at 1.)  This action followed.

## II.  DISCUSSION

Plaintiff argues that the ALJ erred in (A) finding that she did not meet or equal Listing 1.04, (B) determining RFC, and (C) evaluating credibility.  I address each argument in turn.

## A.    Listings

### 1.    Legal Standards

In order to meet a Listing, the claimant must demonstrate that she satisfies all of the specific criteria of the particular section.  <u>Maggard v. Apfel</u>, 167 F.3d 376, 379 (7th Cir. 1999). The claimant can establish "medical equivalence" to a Listing by showing that she has an impairment described in a particular Listing which does not exhibit one or more of the findings specified in that Listing or which exhibits all of the findings but one or more of the findings is not as severe as specified in the Listing, if she has other findings that are at least of equal medical significance to the required criteria.  20 C.F.R. § 404.1526(b)(1).  In considering whether a claimant's condition meets or equals a listed impairment, the ALJ must discuss the Listing by name and offer more than a perfunctory analysis.  <u>Kastner v. Astrue</u>, 697 F.3d 642, 647 (7th Cir. 2012).

### 2.    Analysis

Plaintiff cites Listing 1.04, which covers:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:

A. Evidence of nerve root compression characterized by neuro-anatomic

distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test ["SLR"] (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.

The ALJ discussed Listing 1.04 in plaintiff's case, finding that the medical evidence did not establish the requisite evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis. Nor, the ALJ concluded, was there evidence that plaintiff's back disorder resulted in an inability ambulate effectively, as defined in § 1.00(B)(2)(b).[31] (Tr. at 16.)

Plaintiff contends that later in his decision the ALJ cited evidence contradicting these findings (e.g., MRI's documenting disc herniation and treatment notes documenting reduced range of motion, positive SLR, and antalgic gait), and that he overlooked other pertinent

_____

[31]As discussed above, an ALJ may in some instances satisfy his duty of articulation simply by pointing out the absence of evidence. See Scheck, 357 F.3d at 701. I also note that in this case plaintiff, who was represented by counsel, did not argue Listing 1.04 to the ALJ at the hearing. Rather, counsel focused on mental limitations, including those related to pain. (Tr. at 38, 63.) While this did not relieve the ALJ of his duty to consider whether plaintiff's impairments met or equaled Listing 1.04, it likely explains why he devoted just one paragraph to Listing 1.04 (Tr. at 16) but spent nine paragraphs discussing Listings 12.04, 12.06, and 12.09 (Tr. at 16-18.)

evidence (e.g., treatment notes documenting her limp, pain, and reduced range of motion). (Pl.'s Br. at 16-18.) However, she does even allege, much less demonstrate, that any of this evidence suffices to meet her burden under Listing 1.04. Indeed, it is unclear which subsection of the Listing, if any, she claims to meet. At the beginning of this section of her brief, she cites § 1.04(A), but much of the evidence she discusses on these pages pertains to ambulation, which is a factor under § 1.04(C).

At the end of this section of her main brief, plaintiff contends that she medically <u>equaled</u> the requirements of Listing 1.04. (Pl.'s Br. at 18.) But she then cites evidence pertaining to the specific criteria of § 1.04(A) – nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss/muscle weakness accompanied by sensory or reflex loss, and positive SLR. (Pl.'s Br. at 18, citing Tr. at 252-54, 269, 296-96, 320, 340-41, 388-90, 391-93, 580-82, 597, 617, 699-700, 712.) Regardless of whether she claims this evidence meets or equals the Listing, plaintiff fails to satisfy her burden. While plaintiff's MRI scans documented nerve root compression prior to her surgery (Tr. at 296, 582) and fluid collections contacting the nerve root post-surgery (Tr. at 699), and she at times demonstrated limited range of motion (Tr. at 269) and positive SLR (Tr. at 341, 617), the cited evidence does not document motor loss accompanied by sensory or reflex loss. Plaintiff cites notes from Dr. Johnson's April 2009 consultative exam, but Dr. Johnson found intact motor strength (Tr. at 254), as well as normal range of motion (Tr. at 253) and symmetrical reflexes (Tr. at 254). Plaintiff also cites notes from Dr. Ostman's March 23, 2010 examination, but Dr. Ostman found normal and symmetrical muscular tone and strength, normal deep tendon reflexes, and negative SLR. (Tr. at 392.) Plaintiff cites a September 14, 2011 note from NP Michels, which does document a deficit in deep tendon reflexes, but the note also indicates that

plaintiff could toe and heel walk with no evidence of weakness, with normal muscle strength in the lower extremities, and negative SLR. (Tr. at 712.) Finally, plaintiff claims that an April 1, 2010, physical therapy note documents motor loss or muscle weakness accompanied by sensory or reflex loss. (Pl.'s Reply Br. at 3, citing Tr. at 341, 389-90.) However, I can locate no such finding in these notes. While the therapist noted decreased range of motion, positive SLR, and decreased light touch sensation in the left medial knee and heel, the therapist found that knee extension, ankle dorsiflexion, and great toe extension bilaterally were 5/5. Regarding strength, plaintiff's hip internal and external rotation were 5/5 bilaterally.[32] (Tr. at 341.) Plaintiff contends that the therapist noted that she fell frequently because her leg gave out. The therapist recorded plaintiff's statement about falling in the "subjective" section of the note, but she made no such observation during objective testing. (Tr. at 341.)

Perhaps intending it to serve as a substitute for missing finding(s), plaintiff cites evidence that at times she had trouble ambulating effectively. (Pl.'s Br. at 18, citing Tr. at 253, 269, 341.) As she concedes, however, at other times her gait was normal. (Pl.'s Br. at 18, citing Tr. at 629.) Even on those occasions when gait was an issue, the notes document just "mild difficulty" (Tr. at 253) or inability to "ambulate with equal weightbearing" (Tr. at 341). Under the Listings, "examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single

---

[32]Plaintiff declined to continue with strength testing due to pain. (Tr. at 341.)

hand rail." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b).  None of the medical evidence plaintiff cites in her main brief approaches these examples.

In her reply brief, plaintiff cites additional evidence regarding her difficulty walking.  (Pl.'s Reply Br. at 4-5.)  Contentions first made in reply are ordinarily waived, e.g., Hess v. Reg-Ellen Machine Tool Corp., 423 F.3d 653, 665 (7th Cir. 2005), but even if I consider this evidence under § 1.00(B)(2)(b) the contention fails.[33]  Plaintiff notes that in March 2010, prior to her surgery, Dr. Vasquez found that she walked with a limp (Tr. at 502), and Dr. Ostman noted an antalgic gait (Tr. at 392), but this does not demonstrate ineffective ambulation as required by the Listing.  See, e.g., Hoy v. Astrue, 390 Fed. Appx. 587, 592 (7th Cir. 2010); DiPalma v. Colvin, 951 F. Supp. 2d 555, 571-72 (S.D.N.Y. 2013).  Plaintiff contends that on September 23, 2011, after the surgery, NP Michels noted that plaintiff fell when her leg gave out.  Plaintiff made that report, but on exam NP Michels noted only that plaintiff "ambulates slowly.  She walks with a very slight limp to the left."  (Tr. at 709.)  Plaintiff contends that NP Michel's "examination revealed that Plaintiff could heel/toe walk with weakness."  (Pl.'s Reply Br. at 5.) NP Michel's September 14, 2011 note actually states the opposite: "She is able to toe and heel walk with no evidence of weakness."  (Tr. at 712.)  NP Michels further found, during the same exam, "Muscle strength testing is 5/5 in the lower extremities."  (Tr. at 712.)  Finally, I note that the ALJ considered the evidence regarding plaintiff's slow ambulation, finding that it supported a limitation to sedentary work.  (Tr. at 20.)

Ultimately, plaintiff fails to explain how any of the evidence she cites could lead to a

---

[33]Plaintiff cites some of this evidence in her main brief, but she did not specifically relate it to effective ambulation under § 1.00(B)(2)(b).

finding that she meets or equals Listing 1.04.[34]  Accordingly, the ALJ's failure to discuss this

evidence was, at most, harmless error, see, e.g., Knox v. Astrue, 327 Fed. Appx. 652, 655 (7th

Cir. 2009), and there is no basis for remanding for consideration of medical equivalence.

In her reply brief, plaintiff faults the Commissioner for analyzing the evidence she cited

in her main brief.  She notes that the Commissioner may not, under the Chenery doctrine,

defend an ALJ's decision in court on a ground the ALJ did not himself provide.  E.g., Moon v.

Colvin, 763 F.3d 718, 722 (7th Cir. 2014) (citing SEC v. Chenery Corp., 318 U.S. 80, 87-88

(1943)).  However, there is a difference between the Commissioner citing additional evidence

in order to bolster the ALJ's findings, and reviewing evidence a claimant faults the ALJ for not

discussing to see if that evidence could support a different conclusion (thus supporting

remand).

> [T]he ALJ is not required to discuss every piece of evidence; he need only
> sufficiently articulate his assessment of the evidence to assure the court that he
> considered the important evidence and to enable the court to trace the path of
> his reasoning.  Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993).  A social
> security claimant cannot, consistent with this rule, accuse an ALJ of skipping
> medical records, then raise Chenery as a bar to any consideration by the
> Commissioner or the court of the importance of those records.

Schurr v. Colvin, No. 12-C-0969, 2013 WL 1949615, at *14 n.10 (E.D. Wis. May 09, 2013); see

---

[34]As the Commissioner notes, the DDS consultants considered the Listings, finding no
section met or equaled.  (Tr. at 65, 94.)  "These forms conclusively establish that consideration
by a physician . . . designated by the Commissioner has been given to the question of medical
equivalence at the initial and reconsideration levels of administrative review." Scheck, 357 F.3d
at 700 (internal quote marks omitted).  Plaintiff notes in her reply brief that the ALJ did not
specifically credit the consultants at step three, instead relying on their reports in determining
RFC.  "Because it is proper to read the ALJ's decision as a whole, and because it would be a
needless formality to have the ALJ repeat substantially similar factual analyses at both steps
three and five, [the court may] consider the ALJ's treatment of the record evidence in support
of both his conclusions at steps three and five." Rice v. Barnhart, 384 F.3d 363, 370 n.5 (7th
Cir. 2004).

also <u>Hovi v. Colvin</u>, No. 12-C-169, 2013 WL 3989232, at *15 n.9 (W.D. Wis. Aug 2, 2013) ("Because these records do not contradict the ALJ's conclusion, there is no point in remanding so that he may explicitly discuss them.").

**B.     RFC**

>    **1.     Legal Standards**

RFC is the most a claimant can still do despite her limitations.  SSR 96-8P, 1996 WL 374184, at *2.  In assessing RFC, the ALJ must address both the remaining "exertional" and "non-exertional" capacities of the individual. <u>Id.</u> at *5.  Exertional capacity refers to the person's remaining abilities to perform each of seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling.   The ALJ must consider each function separately before assigning an exertional catagory (e.g., sedentary, light, medium). <u>Id.</u>  Non-exertional capacity considers all work-related limitations and restrictions that do not depend on an individual's physical strength, e.g., postural, manipulative, visual, communicative, and mental functions. <u>Id.</u> at *6.

>    **2.     Analysis**

In the present case, the ALJ found that plaintiff retained the RFC to perform a range of unskilled, low stress, sedentary work involving few workplace changes and only occasional interaction with co-workers and the public.  (Tr. at 18-19.)  Plaintiff makes four RFC-related challenges.

>    **a.     Function-by-Function Assessment**

Plaintiff first argues that the ALJ found her capable of sedentary work without specifying her abilities in each individual function.  As plaintiff concedes, however, the ALJ's failure to

56

provide a function-by-function assessment is harmful only if the ALJ overlooked an important restriction and thereby incorrectly classified the claimant's capacity for work. <u>Zatz v. Astrue</u>, 346 Fed. Appx. 107, 111 (7th Cir. 2009); <u>see also</u> <u>Cichocki v. Astrue</u>, 729 F.3d 172, 177 (2d Cir. 2013) ("[W]e agree with our sister Circuits that remand is not necessary merely because an explicit function-by-function analysis was not performed."). Plaintiff cites evidence regarding her difficulties walking (Pl.'s Br. at 20-21), some of which the ALJ discussed, but she fails to explain how any of it impacts the ALJ's finding that she can perform sedentary work, which is primarily performed seated. SSR 83-10, 1983 WL 31251 , at *5.

### b.  Carpal Tunnel Syndrome

Plaintiff next argues that the ALJ failed to consider any limitations from her carpal tunnel syndrome. The ALJ discussed this impairment at step two, noting that test results indicated it was only of mild severity. The ALJ also noted that plaintiff had not alleged carpal tunnel as a specific impairment or reported any limitations attributable to it. (Tr. at 16.) The ALJ must in determining RFC consider limitations arising from all impairments, even those that are not severe in isolation, <u>e.g.</u>, <u>Murphy</u>, 759 F.3d at 820, but plaintiff cites no medical evidence overlooked by the ALJ suggesting any specific limitations in her use of the hands. She cites a July 29, 2008 noted from NP Michels, which documents strong and equal grip strength and full wrist range of motion (Tr. at 478), and a June 15, 2009, note from NP Michels again documenting strong and equal grip strength and full range of motion, as well as the mild EMG findings cited by the ALJ (Tr. at 491). Given the long-standing nature of her complaints, NP Michels referred plaintiff for a surgical opinion in 2009 (Tr. at 491), but the record contains no evidence that plaintiff followed through. When plaintiff returned to NP Michels in September 2011, she complained about her back but not her hands. (Tr. at 711.) Given the paucity of

57

evidence supporting further restrictions, the ALJ's failure to further discuss carpal tunnel syndrome in determining RFC was harmless. Plaintiff also cites her own hearing testimony that she had problems with her left wrist and hand (Tr. at 51), but the ALJ was not required to accept – and indeed did not fully credit – plaintiff's testimony regarding her limitations. Finally, the state agency consultants reviewed the medical evidence and found no manipulative limitations (Tr. at 75, 644), and Dr. Johnson, who examined plaintiff in 2009 just a few months before she returned to NP Michels regarding her carpal tunnel, found full use of the hands (Tr. at 253). The ALJ appropriately gave weight to these findings. (Tr at 22.)

### c. Consultants' Reports

Plaintiff further argues that the ALJ gave only "some weight" to the consultants' reports, without explaining what he agreed or disagreed with, and thus substituted his opinion for that of the medical experts. See Suide v. Astrue, 371 Fed. Appx. 684, 690 (7th Cir. 2010 ("[The ALJ] is not allowed to 'play doctor' by using her own lay opinions to fill evidentiary gaps in the record, see Blakes v. Barnhart, 331 F.3d 565, 570 (7th Cir. 2003)."). Plaintiff also faults the ALJ for not more fully explaining why he set an RFC for sedentary work, as opposed to light level the consultants recommended.

RFC is an issue reserved to the ALJ, and it must be based on the entire record; the ALJ need not rely solely on the opinions of physicians. Diaz v. Chater, 55 F.3d 300, 306 n.2 (7th Cir. 1995); see also Aguilera v. Colvin, No. 13-C-1248, 2014 WL 3530763, at *24 (E.D. Wis. July 15, 2014) ("[T]he ALJ need not in determining RFC rely on any particular doctor's opinion; rather, he must consider the entire record."). In this case, the ALJ did just that, specifically considering the treatment records received at the hearing level and plaintiff's testimony, as he was required to do. See SSR 96-6p, 1996 WL 374180, at *2 (explaining that consultants'

opinions can be given weight only insofar as they are supported by evidence in the case record, including any evidence received at the ALJ level that was not before the state agency). While the ALJ could perhaps have said more about what in the later evidence supported his conclusions, plaintiff fails to explain how she was harmed by the ALJ's decision to find her more limited than any of the doctors believed. Cf. 20 C.F.R. § 404.1567(b) (explaining that if a claimant can do light work, the SSA will ordinarily determine that she can also do sedentary work).

### d.    Mental RFC

Finally, plaintiff challenges the ALJ's mental RFC determination, although the basis for her argument is unclear. As the Commissioner notes, plaintiff at times appears to challenge the ALJ's step three determination, although in reply she clarifies that her challenge is limited to mental RFC.

Plaintiff first notes that the ALJ found moderate limitations in social functioning, yet purportedly relied on the opinions from consultants Rattan and Edelman, who found mild difficulties in this area. (Tr. at 72, 659.) As with her previous argument, plaintiff fails to explain how she was harmed by the ALJ's decision to find her more limited than the experts believed. Plaintiff contends that Dr. Pierquet's findings, as cited by the ALJ – that she was uncomfortable with unfamiliar people but socialized with people she knew and had daily contact with her boyfriend and family – do not support a moderate difficulty in this area. She notes her reports to treating psychiatrists and psychologists that she feared leaving the house, her OCD symptoms, and her altercation with her daughter. However, she fails to explain how, given the uncontradicted opinion evidence, these scattered reports compelled the ALJ to adopt an even more restrictive mental RFC.

Plaintiff notes that Dr. Rattan found moderate limitation in her ability to accept instructions and respond appropriately to criticism from supervisors. (Pl.'s Br. at 23, citing Tr. at 664.) The ALJ specifically considered and rejected this limitation because it was contrary to Dr. Pierquet's finding that plaintiff could get along with co-workers and supervisors. (Tr. at 22.) Plaintiff never explains why this was wrong or even argues that it was.[35]

Plaintiff claims that Dr. Pierquet found that plaintiff had panic attacks when shopping at grocery stores, gas stations, or when she had to go to work. (Pl.'s Br. at 23, citing Tr. at 290-91.) Dr. Pierquet recorded plaintiff's statement that she had these symptoms, but she made no "finding" in this regard. Plaintiff also claims that "Dr. Pierquet found Plaintiff's panic attacks would only allow her to maintain a part-time work schedule with regular attendance and punctuality." (Pl.'s Reply Br. at 8-9.) Dr. Pierquet made no such finding. In her statement of work capacity, Dr. Pierquet stated:

> Claimant can understand, remember, and carry out simple instructions. Claimant was able to concentrate. Claimant has no difficulty taking directions from supervisors. Claimant can get along with co-workers. Claimant was able to maintain a part-time work schedule with regular attendance and punctuality (although reports missing work because of depression and substance use, resulting in hospitalizations). Good work pace for cognitive but slowed for physical tasks due to back/leg pain. Claimant can tolerate stressful times at work.

(Tr. at 293, emphasis added.) Dr. Pierquet reported that plaintiff had been able to maintain part-time work, but she did not limit plaintiff to part-time work.[36]

---

[35]In her reply brief, plaintiff incorrectly alleges that the ALJ failed to discuss this finding. (Pl.'s Reply Br. at 8.)

[36]Plaintiff's claim that the ALJ failed to discuss Dr. Pierquet's findings (Pl.'s Br. at 23) is incorrect. The ALJ specifically discussed this report, including the notation about part-time work. (Tr. at 22 ¶ 1.)

Plaintiff notes that the ALJ relied on Dr. Rattan's opinion in finding moderate limitations in concentration, persistence, pace, but the ALJ failed to discuss Rattan's mental RFC findings regarding moderate limitations in maintaining attention and concentration for extended periods, performing activities within a schedule, and responding appropriately to changes. But plaintiff fails to acknowledge that the ALJ accounted for these limitations by limiting her to low stress work, free of fast paced production requirements, involving only simple decisions, with few if any workplace changes, and only occasional interaction with the public and coworkers. (Tr. at 18-19.) Plaintiff fails to explain what more the ALJ should have done.

## C.    Credibility

### 1.    Legal Standards

In assessing the credibility of a claimant's statements, the ALJ must first determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. SSR 96-7p, 1996 WL 374186, at *2. If the claimant suffers from no such impairment(s), or if the impairment(s) could not reasonably be expected to produce the claimant's symptoms, the symptoms cannot be found to affect her ability to work. Id. If the ALJ finds that the claimant's impairment(s) could produce the symptoms alleged, he must then determine the extent to which the symptoms limit the claimant's ability to work. Id. For this purpose, whenever the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record, including the claimant's daily activities; the duration, frequency, and intensity of the symptoms; factors that

precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; and any other measures or treatment the claimant uses to relieve the symptoms. Id. at *2-3.

The reviewing court gives special deference to an ALJ's credibility determination and will not overturn it unless it is patently wrong. Schomas, 732 F.3d at 708. While the ALJ must provide "specific reasons" for his finding, the court will not reverse just because the ALJ failed to discuss each and every one of SSR 96-7p's credibility factors. See, e.g., Clay v. Apfel, 64 F. Supp. 2d 774, 781 (N.D. Ill. 1999); see also Brown v. Barnhart, 298 F. Supp. 2d 773, 792 (E.D. Wis. 2004) ("ALJs are not required to produce prolix opinions containing checklists from all of the regulations."). Ultimately, the court will affirm so long as the ALJ explained his decision in such a way that allows the court to determine whether he reached his decision in a rational manner, logically based on his specific findings and the evidence in the record. McKinzey v. Astrue, 641 F.3d 884, 890 (7th Cir. 2011); see also Skarbek v. Barnhart, 390 F.3d 500, 505 (7th Cir. 2004) ("This court will affirm a credibility determination as long as the ALJ gives specific reasons that are supported by the record for his finding.").

**2.  Analysis**

In the present case, the ALJ provided a detailed evaluation of plaintiff's credibility, covering virtually all of the SSR 96-7p factors. (Tr. at 19-21.) He first summarized plaintiff's allegations, including her claims of debilitating back pain, difficulty lifting or performing postural activities, and left foot numbness causing falls. He also discussed her use of pain medications, which caused upset stomach but did not fully relieve the pain, and other treatment modalities for pain, including epidural injections and a TENS unit, as well as her use of medications for her mental impairments. He further discussed her claimed standing, sitting, walking, and lifting

tolerances, as well as her reported daily activities.  (Tr. at 19.)

The ALJ then provided several specific reasons for finding plaintiff only partially credible.  He first reviewed the objective medical evidence, finding that while it supported significant restrictions – sedentary work with postural limitations and a sit/stand option – it failed to provide strong support for plaintiff's allegations of disabling symptoms and limitations.  (Tr. at 19-20.)  The ALJ noted that plaintiff continued to make subjective complaints despite objective improvement, that she did not display pain behavior during her lengthy exam with Dr. Pierquet, that Dr. Paul found neck surgery unnecessary, and that plaintiff's back surgery was generally successful in relieving her symptoms.  (Tr. at 20-21.)  Regarding her mental impairment, the ALJ noted that mental status exams were generally benign and not supportive of disabling symptoms, more recent treatment notes indicated improvement in functioning, and GAF scores were generally between 60 and 65.  (Tr. at 21.)  The ALJ further noted that plaintiff's activities were not limited to the extent one would expect given her claims of pain and other symptoms.  He specifically noted that she engaged in chores that required frequent bending, inconsistent with her claims of disabling back pain.  He also noted that she worked part-time, took college courses, and engaged some social interaction, all of which were inconsistent with the alleged severity of her anxiety.  These activities further suggested a sufficient ability to concentrate on simple tasks.  (Tr. at 21.)  Finally, the ALJ noted plaintiff's non-compliance with medication, her receipt of unemployment benefits, and her search for work.  (Tr. at 21.)

Plaintiff contends that the ALJ failed to discuss medication side effects (Pl.'s Br. at 24), but that is incorrect (Tr. at 19).  While he did not specifically discuss all of the evidence plaintiff cites in her brief, he did not have to.  See Schmidt v. Barnhart, 395 F.3d 737, 744 (7th Cir. 2005) (noting that the ALJ need not provide a complete written evaluation of every piece of

testimony and evidence). Plaintiff fails to explain how any of this evidence undermines the ALJ's conclusion, given the numerous, specific reasons he gave.

Plaintiff notes that the ALJ considered her receipt of unemployment benefits, which she testified she collected because she had no income. (Tr. at 42-43.) However, this was not an improper consideration, see, e.g., Schmidt v. Barnhart, 395 F.3d 737, 746 (7th Cir. 2005) ("[W]e are not convinced that a Social Security claimant's decision to apply for unemployment benefits and represent to state authorities and prospective employers that he is able and willing to work should play absolutely no role in assessing his subjective complaints of disability."), and at the hearing the ALJ gave plaintiff an opportunity to explain why she applied for unemployment (Tr. at 41-43).

Plaintiff notes that the ALJ considered her part-time employment and college course-work without recognizing that she lost her job after she was hospitalized. The ALJ did not cite this evidence as proof that plaintiff was not disabled but rather as evidence undercutting her claims of crippling anxiety. See Feyen v. Colvin, No. 13-C-1380, 2014 WL 4494524, at *6 (E.D. Wis. Sept. 11, 2014) (indicating that while SSR 96-8p requires evaluation of the claimant's ability to work full-time, a claimant's part-time work may undercut her claims if it involves tasks beyond her alleged capacity, and collecting cases).

Finally, plaintiff argues that the ALJ failed to consider her testimony that she was in constant pain, but this is incorrect. The ALJ noted the allegation (Tr. at 19) but found, based on the entire record, that he could not fully accept it.

Ultimately, even if some of the reasons the ALJ gave do not withstand close scrutiny, his determination must be upheld so long as enough of them are valid. Halsell v. Astrue, 357 Fed. Appx. 717, 722-23 (7th Cir. 2009) (citing Simila v. Astrue, 573 F.3d 503, 517 (7th Cir. 2009);

<u>Shramek v. Apfel</u>, 226 F.3d 809, 811 (7th Cir. 2000)).  Given the ALJ's detailed discussion of credibility, plaintiff cannot show that his determination was patently wrong.[37]

### III.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 25th day of October, 2014.

/s Lynn Adelman
LYNN ADELMAN
District Judge

---

[37]I note that at one point in his decision the ALJ used boilerplate credibility language the Seventh Circuit disfavors.  (Tr. at 20.)  However, plaintiff does not raise this as error, and in any event the ALJ provided specific reasons for his conclusion making use of the boilerplate harmless.  <u>See</u> <u>Filus v. Astrue</u>, 694 F.3d 863, 868 (7th Cir. 2012).